**In re Private Criminal Complaint of John D. WILSON II**

**Appeal of John D. Wilson II.**

Superior Court of Pennsylvania.

Argued Sept. 9, 2004.
Filed June 6, 2005.

---

**2.** A secondary problem with the case *sub judice* is that the penalty is facially harsh. A twenty-five year mandatory minimum for a seemingly minor offense of burglary of $76.00 and a brassiere is extreme. However, no challenge is before us concerning the constitutionality of the punishment. *See Ewing v. California,* 538 U.S. 11, 123 S.Ct. 1179, 155 L.Ed.2d 108 (2003) (holding, in a five to four decision, that a twenty-five year minimum sentence for stealing three golf clubs pursuant to California's three-strikes law did not violate the Eighth Amendment, and that any criticism for the statute is properly directed at the legislature) (citing *Rummel v. Estelle,* 445 U.S. 263, 100 S.Ct. 1133, 63 L.Ed.2d 382 (1980), in which a life sentence was given for a three-time felon where the underlying offense was obtaining $120.75 by false pretenses). However, there is precedent for finding an Eighth Amendment violation for an unduly harsh penalty imposed pursuant to a three-strikes law. *See Crosby v. State,* 824 A.2d 894 (Del.2003) (holding that an effective life sentence of forty-five years for second-degree forgery was excessive and that a life sentence was cruel and unusual in violation of the Eighth Amendment). *See also Solem v. Helm,* 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983) (holding that it was a violation of the Eighth Amendment to sentence a defendant to life for a seventh non-violent felony of writing a bad check for $100.00).

200

James L. Moran, Erie, for appellant.

John P. Garhart, Asst. Dist. Atty., Erie, for Com., appellee.

Before: FORD ELLIOTT, STEVENS, MUSMANNO, LALLY–GREEN, TODD, KLEIN, BENDER, BOWES, and GANTMAN, JJ.

GANTMAN, J.:

¶ 1 This Court granted *en banc* review of the order entered in the Erie County Court of Common Pleas, which denied Appellant, John D. Wilson II's petition for approval of his private criminal complaint. Appellant asks whether the trial court erred when it deferred to the decision of the District Attorney's office to disapprove the complaint, although Appellant had presented evidence of a *prima facie* case. Appellant also asks whether the District Attorney's office abused its discretion in disapproving his private criminal complaint for the policy reasons given. As prefatory matters, we must also determine whether Appellant has standing to appeal the trial court's order and, if so, what is the applicable standard and scope of appellate review in this context. We hold Appellant has standing to appeal the trial court's order sustaining the District Attorney's disapproval of Appellant's private criminal complaint. Applying the proper standard and scope of review as enunciated in this case, we affirm the trial court's order, which

deferred to the District Attorney's decision to disapprove Appellant's private criminal complaint.

¶ 2 In its opinion, the trial court comprehensively summarized the relevant facts of this case as follows:

In the early morning hours of August 10, 2002, [Appellant] was a passenger in the front seat of a Dodge Dynasty traveling north on State Street in Erie, Pennsylvania. As the vehicle passed the Hallman Chevrolet Dealership, [Appellant] used a Super Soaker squirt gun to squirt an individual who was walking in front of the dealership. The gun in question measures roughly 30 inches by 12 inches, has multiple nozzle settings, holds approximately 86 ounces of water, and has a pumping mechanism with which to increase the pressure of the water stream. The stream of water struck the pedestrian in the eye causing him to temporarily lose vision in his left eye.

The pedestrian [Appellant] squirted was Charles Bowers, the Chief of the Erie Bureau Police, who was off duty at the time of the incident. Chief Bowers immediately got into his unmarked vehicle and followed the Dynasty north on State Street. Chief Bowers activated the lights on his vehicle, but did not activate the siren. After turning east on 14th Street, the driver of the vehicle pulled the car to the side of the road. Chief Bowers approached the passenger side of the vehicle. In addition to the driver and Petitioner, there were two other passengers in the backseat of the vehicle.

According to Chief Bowers, he observed [Appellant] turn toward the center of the vehicle. Fearing [Appellant] might be moving for some kind of weapon,

Chief Bowers reached through the open passenger window and struck [Appellant] in the face. Chief Bowers told investigators that he merely cuffed[1] [Appellant] in an effort to distract him until the Chief could ascertain whether [Appellant] had a weapon. Witnesses in the vehicle alleged that Chief Bowers punched [Appellant] in the nose with a closed fist. Thereafter, Chief Bowers began yelling obscenities and pulled [Appellant] from the vehicle.

Here, again, the evidence is conflicting. According to witnesses, Chief Bowers grabbed a chain around [Appellant's] neck and [his] belt, lifted [Appellant] off the ground and either forced or slammed him against the roof of the vehicle. Chief Bowers claimed that he did force [Appellant] against the car, but he denied that [Appellant's] feet ever left the ground or that he grabbed [Appellant's] chain.

By this time, other City of Erie Police officers had arrived on the scene. [Appellant] was handcuffed, placed in a marked police vehicle, and driven to the police station for booking and arrest. The vehicle's other occupants were transported to the police station as well. Pursuant to normal booking procedures, a booking sheet was created for [Appellant]. On the booking sheet, there is a space for the arrestee to indicate if he is hurt. [Appellant's] booking sheet indicates that no, he was not hurt. [Appellant] was charged with disorderly conduct in response to this incident and released at approximately 2:45 A.M.

Later that day, [Appellant] presented to a local hospital complaining that his face was sore, his nose was tender, and there was some blurriness in his left eye. [Appellant] was diagnosed with a questionable nasal fracture and superficial

---

1. Here, the word "cuffed" means to strike with an open hand.

abrasions of the neck and hips. X-rays confirmed there was a questionable linear hairline fracture at the base of the nasal bridge. [Appellant] was seen by a physician again on August 13, 2002. At that time he complained of nose bleeds and nasal congestion since the date of the incident. The physician diagnosed [Appellant] with a nasal contusion, possibly a nondisplaced nasal fracture and nasal congestion. The physician's notes indicate that a thin-section CT might be helpful in providing a more definitive diagnosis.

On or about September 26, 2002, [Appellant] filed a Private Criminal Complaint against Chief Charles Bowers accusing him of assault, recklessly endangering another person, and official oppression. District Justice Paul G. Urbaniak forwarded the private complaint to the District Attorney's office for possible approval. Upon receipt of the private complaint, Detective Joseph Spusta was assigned to conduct an investigation into the matter. As part of his investigation, Detective Spusta interviewed Chief Bowers, the three other teenagers with [Appellant] that evening, and the other officers who responded to the scene. Additionally, the District Attorney's office reviewed the following materials: any and all medical reports including Saint Vincent's Health Center, private practitioners' reports and x-rays; written statement of the supervisor of the police communications center; booking records for [Appellant]; radio transmissions relevant to the incident; press release prepared by the Erie Bureau of Police; report of Detective Joseph Spusta; report prepared by Lt. D.J. Fuhrman; applicable law relating to criminal offenses of simple assault, official oppression, and recklessly endangering; the Super Soaker guns in question; and the supporting affidavit of [Appellant].

On October 17, 2002, District Attorney Bradley Foulk disapproved the private complaint for the following reasons:

Based upon an exhaustive review of the available evidence, the Commonwealth exercises its discretion and disapproves the filing of the attached Private Criminal Complaint for the following reasons:

a. Commonwealth is not inclined to commit the prosecution [sic] resources of this office inasmuch as the likelihood of a conviction is minimal, if nonexistent, and/or there is an extreme likelihood of acquittal if continued further;

b. The victim in this case, if so inclined, has a more than adequate civil remedy available to him for any personal injury or pecuniary loss incurred by him. It should be noted that the Commonwealth fails to see even a *prima facie* showing of a nasal fracture in this case.

[Appellant] appealed the disapproval of his private complaint to the [C]ourt of [C]ommon [P]leas as provided by [Pa. R.Crim.P.] 506(b)(2).

(Trial Court Opinion, filed December 19, 2002, at 1–4). "After reviewing the District Attorney's investigatory file, the statements of the parties and witnesses, the medical records of [Appellant], and considering the arguments and briefs of counsel," the trial court denied Appellant's petition. (*Id.* at 1). Appellant timely filed this appeal.

¶ 3 Appellant raises two issues:

WHETHER THE [COURT OF COMMON PLEAS] COMMITTED ERROR IN REFUSING TO APPROVE THE PRIVATE CRIMINAL COMPLAINT BY DEFERRING TO THE DECISION MADE BY THE DISTRICT ATTORNEY WHEN THERE WAS EVI-

DENCE OF A *PRIMA FACIE* CASE OF CRIMINAL ACTIVITY?

WHETHER THE [COURT OF COMMON PLEAS] ERRED IN REFUSING TO APPROVE THE PRIVATE CRIMINAL COMPLAINT WHEN THE DISTRICT ATTORNEY'S OFFICE GROSSLY ABUSED ITS DISCRETION?

(Appellant's Brief at v). This Court also directed the parties to address the proper standard/scope of review in cases involving the District Attorney's approval/disapproval of a private criminal complaint.

¶ 4 As a prefatory matter, we address the Commonwealth's claim that Appellant lacks standing to appeal the order under review. Specifically, the Commonwealth insists that once the District Attorney disapproves a private criminal complaint on policy grounds (described as "policy-declination" cases), and the Court of Common Pleas refuses to disturb the District Attorney's decision, Appellant exhausted his rights under Pa.R.Crim.P. 506. The Commonwealth concedes there is Pennsylvania law contrary to its position on standing, but urges a change in the law. The Commonwealth reasons a private criminal complainant has "an adequate measure of due process commensurate with the minimal role of [private] individuals in the modern criminal justice system," when he obtains judicial review in the Court of Common Pleas. (Commonwealth's Brief at 6). Citing the dissenting opinion of Judge Cirillo in *Commonwealth v. Muroski*, 352 Pa.Super. 15, 506 A.2d 1312 (1986) (*en banc*) and the dissenting opinion of now President Judge Del Sole set forth in *In re Wood*, 333 Pa.Super. 597, 482 A.2d 1033 (1984),

the Commonwealth reasons Appellant, as a private criminal complainant, has no judicially cognizable interest in the prosecution or non-prosecution of another person, when the individual private criminal complainant is neither prosecuted nor threatened with prosecution. Because criminal "prosecutions are sought to rectify injuries to society, the only aggrieved party, if one exists, is the Commonwealth." (Commonwealth's Brief at 8–9) (citing *Muroski, supra* at 34, 506 A.2d 1312 (Cirillo, J. dissenting)).

¶ 5 Integrated within its standing argument is the Commonwealth's position that disallowing further review of the District Attorney's decision in policy-declination cases, beyond the Court of Common Pleas, strikes a proper balance between competing interests arising from the separation of powers and preserves the mutual respect and deference each governmental branch owes the other. The Commonwealth suggests that allowing further appellate review in policy-declination cases improperly permits inquiry into the discretionary sphere of the prosecutor's function, which runs afoul of the doctrine of separation of powers. The Commonwealth concludes we should deny appellate review in this case on standing grounds.[2] We cannot agree.

¶ 6 Rule 506 of the Pennsylvania Rules of Criminal Procedure governs private criminal complaints to institute criminal proceedings in court cases as follows:

**Rule 506. Approval of Private Complaints**

(A) When the affiant is not a law enforcement officer, the complaint shall be submitted to an attorney for the Com-

---

**2.** The Commonwealth asserts it is addressing these concepts of standing and separation of powers solely as to appeals to the **Superior Court**, while the Commonwealth concedes Rule 506 allows for judicial review of private

criminal complaints in the Court of Common Pleas. Because of the unique limitation of its challenges, the Commonwealth raises these arguments for the first time on appeal. Therefore, we will not deem these claims waived.

monwealth, who shall approve or disapprove it without unreasonable delay.

(B) If the attorney for the Commonwealth:

(1) approves the complaint, the attorney shall indicate this decision on the complaint form and transmit it to the issuing authority;

(2) disapproves the complaint, the attorney shall state the reasons on the complaint form and return it to the affiant. Thereafter, the affiant may petition the court of common pleas for review of the decision.

Pa.R.Crim.P. 506. Pennsylvania law also states:

Standing is a requirement that parties have sufficient interest in a matter to ensure that there is a legitimate controversy before the court. In determining whether a party has standing, a court is concerned only with the question of who is entitled to make a legal challenge and not the merits of that challenge. As a general matter, the core concept of the doctrine of standing is that a person who is not adversely affected in any way by the matter he seeks to challenge is not "aggrieved" and has no right to obtain a judicial resolution of his challenge.

In re T.J., 559 Pa. 118, 124–25, 739 A.2d 478, 481 (1999).

Standing may be had through a variety of ways. The legislature may grant it explicitly to an agency or individual by statute; the legislature may grant it implicitly to an agency by investing it with certain "functions, duties and responsibilities"; or it may be permitted under common law where the status of the petitioner is that of an "aggrieved" party.

In re Hickson, 765 A.2d 372, 376 (Pa.Super.2000), affirmed, 573 Pa. 127, 821 A.2d 1238 (2003) (citing In re T.J., supra).

¶ 7 In the context of private criminal complaints and Rule 506, traditional common law standing principles apply. In re Hickson, 573 Pa. 127, 821 A.2d 1238 (2003). In that case, our Supreme Court addressed the applicable standing principles as follows:

[A]s a general policy . . . a party seeking judicial resolution of a controversy in this Commonwealth must, as a prerequisite, establish that he has standing to maintain the action. Our Commonwealth's standing doctrine is not a senseless restriction on the utilization of judicial resources; rather, it is a prudential, judicially-created tool meant to winnow out those matters in which the litigants have no direct interest in pursuing the matter.[5] Such a requirement is critical because only when parties have sufficient interest in a matter [is it] ensure[d] that there is a legitimate controversy before the court.

[5] We note that in the federal courts, the standing doctrine springs from a constitutional source. State courts, however, are not governed by Article III and are thus not bound to adhere to the federal definition of standing. Furthermore, the Pennsylvania Constitution has no counterpart to Article III's "case or controversy" requirement. While it is not constitutionally compelled, our standing doctrine nonetheless has a long, venerable history as a useful tool in regulating litigation.

In practical terms, we are assured that there is a legitimate controversy if the proponent of a legal action has somehow been "aggrieved" by the matter he seeks to challenge. A litigant can establish that he has been "aggrieved" if he can show that he has a substantial, direct and immediate interest in the outcome of the litigation in order to be deemed to have standing. A "substantial" interest is an interest in the outcome of the litigation which surpasses the common interest of all citizens in procuring obe-

dience to the law. A "direct" interest requires a showing that the matter complained of caused harm to the party's interest. An "immediate" interest involves the nature of the causal connection between the action complained of and the injury to the party challenging it. Yet, if that person "is not adversely affected in any way by the matter he seeks to challenge[, he] is not "aggrieved" thereby and has no standing to obtain a judicial resolution of his challenge. In particular, it is not sufficient for the person claiming to be "aggrieved" to assert the common interest of all citizens in procuring obedience to the law."

After careful consideration, we hold that traditional standing principles are equally applicable in the Rule [506] context as they are to other matters. Of particular importance is the assurance that there is indeed a legitimate controversy before the court. In fact, we find it difficult to fathom when this assurance would prove to be more critical than when the subject matter is the alleged commission of criminal acts and the prosecution of individuals for their alleged role in those acts.

Having determined that, in general, the traditional approach to standing has a place in Rule [506] matters, we must now determine who has standing to seek judicial review of the disapproval of a private criminal complaint.

\* \* \*

■ [The Commonwealth's] contention presupposes that Rule [506]'s private criminal complaint process springs from this Commonwealth's view that crimes affect the citizenry as a whole, and are most appropriately prosecuted by a governmental entity. It does not. Rather, its historical genesis long predates our modern system's belief that crime injures society as a whole.

In colonial Pennsylvania, crimes were viewed "as an offense against the individual victim[,]" and private prosecutions were the most common mode by which the criminal justice system functioned in the colonial era. This was consonant with the English common law principle that the Crown did not supply a public prosecutor to handle routine felonies. The victim or his family was therefore required to hire counsel to bring the guilty party into the criminal justice system. In fact, the victim served a multifunction role, in which he apprehended, prosecuted, and sometimes even jailed the accused.

In the post-Revolutionary era, the state, as the representative for society as a whole, began to be seen as the injured party in criminal matters, and the role of the government in prosecuting criminal matters began to grow; ultimately, the Pennsylvania Legislature established the office of district attorney in 1850. Yet, with this shift in how crimes were generally prosecuted, a citizen's right to pursue his victimizer in criminal courts *via* a private criminal complaint was never abolished in this Commonwealth. Rather, the Legislature enshrined it in statutory enactments, and later, this [C]ourt provided an avenue *via* the predecessor to Rule [506].

Based on this history, we find that provisions authorizing private criminal complaints, such as Rule [506], have their roots in a time when crimes were viewed as an offense against individuals rather than the state, visiting upon directly involved parties a harm greater than that experienced by the population as a whole. Thus, in contrast to the prosecutions initiated by the Commonwealth, it is the recognition that a crime has caused an individual a substantial,

direct, and immediate injury that is a personal one that animates Rule [506] prosecutions. This is the interest-the interest of seeking justice for harm arising from a crime that directly impacted on oneself-that must be established to show that a party may seek judicial review of the disapproval of a private criminal complaint brought pursuant to Rule [506].

The Superior Court sharply defined which types of people could meet this standing test. Namely, the [Superior Court] stated that only victims, their families or designated personal representatives would have standing. We agree that in most instances, it will be the victim or the victim's family that can meet such a test. It is axiomatic that those most likely to be affected by a crime will be the victim himself or his relatives. It may even be quite rare that an individual outside this group would be able to meet the standing test. Yet, unlike the Superior Court..., we do not find it prudent to limit standing artificially to this group of people. Rather, it is possible that other individuals who are not related to the victim may be able to show that the crime visited upon them a substantial, direct and immediate injury.

*Id.* at 135–39, 821 A.2d at 1243–45 (2003) (internal citations and most quotation marks omitted). Thus, if the complainant meets the common law standing requirements to initiate a private criminal complaint under Rule 506, then he also has standing to seek Rule 506 review of the District Attorney's disapproval in the Court of Common Pleas. *Id.*

█ ¶ 8 Further, the private criminal complainant, who seeks an order from the Court of Common Pleas directing the District Attorney to initiate prosecution, is a party with the right to appeal the court's order denying his request and rejecting his complaint. *Muroski, supra; Wood supra.* See also Pa.R.A.P. 501 (providing: "Except where the right of appeal is enlarged by statute, any party who is aggrieved by an appealable order, or a fiduciary whose estate or trust is so aggrieved, may appeal therefrom"); Pa. R.A.P. 908 (stating in relevant part: "All parties to the matter in the court from whose order the appeal is being taken shall be deemed parties in the appellate court..."). *Compare Commonwealth v. Malloy,* 304 Pa.Super. 297, 450 A.2d 689 (1982) (holding private criminal complainant did not have standing to appeal from dismissal of criminal charges, which Commonwealth filed against defendants but court dismissed, after preliminary hearing, based upon Commonwealth's failure to establish *prima facie* case; and quashing complainant's privately filed notice of appeal, where district attorney refused to appeal or authorize complainant to do so on behalf of Commonwealth, as Commonwealth had assumed status of "party" for purposes of appeal when it proceeded with public prosecution of charges).

¶ 9 With respect to the doctrine of separation of powers, we note:

One of the distinct and enduring qualities of our system of government is its foundation upon separated powers. A basic precept of our form of government is that the executive, the legislature and the judiciary are independent, co-equal branches of government. Under the principle of separation of the powers of government, ... no branch should exercise the functions exclusively committed to another branch. The separation of powers doctrine has historically protected the judiciary against incursions into areas other than its conduct of adversary litigation.

\* \* \*

■    Furthermore, as the ultimate interpreter of the Pennsylvania Constitution, it is clear that this Court bears the responsibility of determining whether a matter has been exclusively committed to one branch of the government.    .

*Commonwealth v. Mockaitis*, 575 Pa. 5, 24, 834 A.2d 488, 499–500 (2003).

Implicit in the separation of powers doctrine is the concept of the inherent power of the judiciary.

The allocation of [the] governmental powers to three distinct branches averts the danger inherent in the concentration of absolute power in a single body:

> The accumulation of all powers, legislative, executive, and judiciary, in the same hands, whether of one, a few, or many, and whether hereditary, self-appointed, or elective, may justly be pronounced the very definition of tyranny.

The Federalist No. 47 (J. Madison). However, the separation of powers would not achieve this prophylactic effect unless it also prevented one branch from usurping the powers committed to the other branches of government.    **The crucial function of the separation of powers principle, therefore, is not separation *per se*, but the "checking" power each branch has over the others.**

The very genius of our tripartite Government is based upon the proper exercise of their respective powers together with harmonious cooperation [among] the three independent Branches. When the anticipated cooperation falters, however, the Judiciary must exercise its inherent power to preserve the efficient and expeditious administration of Justice and protect it from being impaired or destroyed.

*Com., ex rel. Jiuliante v. County of Erie*, 540 Pa. 376, 389, 657 A.2d 1245, 1251–52

(1995) (most internal citations and quotation marks omitted) (emphasis added).

> By a host of authorities in our own and other jurisdictions it has been established as an elementary principle of law that courts will not review the actions of governmental bodies or administrative tribunals involving acts of discretion, in the absence of bad faith, fraud, capricious action or abuse of power; they will not inquire into the wisdom of such actions or into the details of the manner adopted to carry them into execution. It is true that the mere possession of discretionary power by an administrative body does not make it wholly immune from judicial review, but the scope of that review is limited to the determination of whether there has been a manifest and flagrant abuse of discretion or a purely arbitrary execution of the agency's duties or functions. That the court might have a different opinion or judgment in regard to the action of the agency is not a sufficient ground for interference; Judicial discretion may not be substituted for Administrative discretion.

*In re Petition of Acchione*, 425 Pa. 23, 30, 227 A.2d 816, 820 (1967) (internal citation omitted). This standard applies to a prosecutor's discretionary decisions. *See Commonwealth v. Slick*, 432 Pa.Super. 563, 639 A.2d 482, 483, (1994), *appeal denied*, 538 Pa. 669, 649 A.2d 671 (1994). Finally, we note:

> [T]he Pennsylvania Constitution gives our [S]upreme [C]ourt the exclusive power to establish rules of procedure for our judicial system. . . . The function of this Court is limited to maintaining and effectuating the law as established by our [S]upreme [C]ourt. *Commonwealth v. Dugger*, 506 Pa. 537, 486 A.2d 382 (1985). Thus, we are not empowered to declare that a rule established by the

[S]upreme [C]ourt violates the separation of powers doctrine.

*Commonwealth v. Brown,* 447 Pa.Super. 454, 669 A.2d 984, 988 (1995) (*en banc*), *judgment affirmed by,* 550 Pa. 580, 708 A.2d 81 (1998) (some internal citations omitted) ("*Brown I*" and "*Brown II*" respectively).

▇ ¶ 10 In the instant case, Appellant initiated a private criminal complaint, asserting he was the victim of criminal offenses committed by Chief Bowers. After the District Attorney disapproved Appellant's private criminal complaint, Appellant sought Rule 506 review in the Court of Common Pleas. Following its review of the District Attorney's investigatory file, the statements of the parties and witnesses, Appellant's medical records, and consideration of the arguments and briefs of counsel, the court issued an order sustaining the District Attorney's disapproval of the complaint. In effect, the court refused Appellant's request to direct the District Attorney to prosecute Appellant's private criminal complaint. Therefore, Appellant is an aggrieved party with the right to appeal the court's order denying his request and rejecting his complaint. *See Muroski, supra; Wood, supra.* See also Pa.R.A.P. 501; Pa.R.A.P. 908. We decline the Commonwealth's request to disturb these established rules of law and court.

▇ ¶ 11 With respect to the Commonwealth's separation of powers argument, limited as it is to the power of the **appellate** Courts to review a trial court order sustaining the District Attorney's disapproval of the private criminal complaint, the Commonwealth has not given us any new basis or in-depth justification to conclude that appellate review improperly infringes on the District Attorney's executive powers in this context. Under Pennsylvania law, the District Attorney's discretionary power in the area of private criminal complaints does not make that office wholly immune from judicial review. *See In re Petition of Acchione, supra.* Moreover, the Commonwealth's position would allow the Court of Common Pleas to review the District Attorney's decision without providing a mechanism to correct any possible improper assessment of that decision. *See Commonwealth v. Benz,* 523 Pa. 203, 209 n. 6, 565 A.2d 764, 768 n. 6 (1989). Accordingly, we cannot conclude Appellant's right to appeal is violative of the separation of powers doctrine. *See Brown I, supra.*

¶ 12 We now direct our attention to Appellant's argument on appeal. Appellant contends he presented *prima facie* evidence to support the criminal prosecution of Police Chief Bowers on charges of simple assault,[3] recklessly endangering another person,[4] and official oppression.[5] Appellant maintains the District Attorney's decision to disapprove the private criminal complaint is suspect, because Appellant established a *prima facie* case of injury, including a "nasal fracture." Appellant also questions the District Attorney's decision, as a matter of policy, to refuse to commit the resources of his office to a case where the likelihood of a conviction was minimal. Appellant asserts the District Attorney is merely "paying lip service" to appellate decisions by couching his legal assessment of the case in "policy" language to escape scrutiny. Appellant insists the District Attorney is just "hiding behind a 'policy decision,'" which is specious and in "bad faith." (Appellant's Brief at 19, 21).

**3.** 18 Pa.C.S.A. § 2701.

**4.** 18 Pa.C.S.A. § 2705.

**5.** 18 Pa.C.S.A. § 5301.

¶ 13 According to Appellant, the facts of this case show there is as much, if not more, likelihood of a conviction as an acquittal. Appellant submits when the District Attorney made a general statement that the case lacked prosecutorial merit, he did so just to obtain the court's discretionary review, which in itself constitutes an abuse of his prosecutorial discretion. Appellant urges that the District Attorney's decision was based solely on a legal assessment of the case. Thus, Appellant concludes we should apply a *de novo* standard of review on appeal and reverse the trial court's decision to accord deference to the District Attorney.

¶ 14 The Commonwealth responds that Pa.R.Crim.P. 506 intends only narrow or limited judicial review of a District Attorney's policy reasons for declining to prosecute a private criminal complaint. According to the Commonwealth, the proper standard for review of such policy decisions is an abuse of discretion standard, which: (1) is consistent with the narrow judicial oversight contemplated in Rule 506 and (2) allows for proper deference to the District Attorney in the exercise of discretionary prosecutorial powers.

¶ 15 With respect to Appellant's private criminal complaint, the Commonwealth submits the trial court properly deferred to the District Attorney's decision to disapprove it. The Commonwealth concludes there is no record evidence in this case of bad faith, fraud, or unconstitutionality on the part of the District Attorney that could

have led the trial court to override the District Attorney's decision or lead this Court to overturn the trial court's decision. For the following reasons, we agree.

¶ 16 We begin our analysis with statements of general consensus in Pennsylvania law. A private criminal complaint must at the outset set forth a *prima facie* case of criminal conduct. *In re Private Complaint of Adams*, 764 A.2d 577 (Pa.Super.2000) (citing *Commonwealth v. Jury*, 431 Pa.Super. 129, 636 A.2d 164 (1993), *appeal denied*, 537 Pa. 647, 644 A.2d 733 (1994)). Nevertheless, "A well-crafted private criminal complaint cannot be the end of the inquiry for the prosecutor." *Adams, supra* at 580. The district attorney must investigate the allegations of a properly drafted complaint to enable the exercise of his discretion concerning whether to approve or disapprove the complaint.[6] *Muroski, supra.*[7] Nevertheless,

[E]ven if the facts recited in the complaint make out a *prima facie* case, the district attorney cannot blindly bring charges, particularly where an investigation may cause [him] to question their validity. Forcing the prosecutor to bring charges in every instance where a complaint sets out a *prima facie* case would compel the district attorney to bring cases [he] suspects, or has concluded *via* investigation, are meritless. The public prosecutor is duty bound to bring only those cases that are appropriate for prosecution. This duty continues throughout a criminal proceeding and

---

6. The district attorney's office can also refer the private criminal complainant to the police or other agency for investigation of charges. *See, e.g., In re Private Complaint of Owens Against Coker*, 810 A.2d 172 (Pa.Super.2002), *appeal denied*, 573 Pa. 672, 821 A.2d 587 (2003) (referring private criminal complainant to police where district attorney's unit did not have facilities to conduct investigation of felony cases).

7. "[S]uch investigation is not necessary where the allegations of criminal conduct in the complaint are unsupported by factual averments. Both the district attorney and the trial court have a responsibility to prevent the misuse of judicial and prosecutorial resources in the pursuit of futile prosecutions." *Muroski, supra* at 1317.

obligates the district attorney to withdraw charges when [he] concludes, after investigation, that the prosecution lacks a legal basis.

*Id.* (citing generally *In re Petition of Piscanio*, 235 Pa.Super. 490, 344 A.2d 658 (1975)). *Accord Commonwealth v. Metzker*, 442 Pa.Super. 94, 658 A.2d 800 (1995); *In re Maloney*, 431 Pa.Super. 321, 636 A.2d 671 (1994).

The district attorney is permitted to exercise sound discretion to refrain from proceeding in a criminal case whenever he, in good faith, thinks that the prosecution would not serve the best interests of the state. This decision not to prosecute may be implemented by the district attorney's refusal to approve the private criminal complaint at the outset....

*Malloy, supra* at 692.

¶ 17 If the district attorney disapproves a private criminal complaint, the complainant can petition the Court of Common Pleas for Rule 506 review. *Adams, supra* at 579.

Where the district attorney's denial [of a private criminal complaint] is based on a legal evaluation of the evidence, the trial court undertakes a *de novo* review of the matter. Where the district attorney's disapproval is based on policy considerations, the trial court accords deference to the decision and will not interfere with it in the absence of bad faith, fraud or unconstitutionality. In the event the district attorney offers a hybrid of legal and policy reasons for disapproval, deference to the district attorney's decision,

rather than *de novo* review is the appropriate standard....

*Id.* (quoting *Commonwealth v. Cooper*, 710 A.2d 76, 79–80 (Pa.Super.1998)). *See also Owens supra.*

¶ 18 The trial court must first correctly identify the nature of the district attorney's reason(s) for denying a private criminal complaint. *Cooper, supra.* Although a district attorney's legal evaluation of the evidence standing alone is subject to *de novo* review, there is no simple formula for the trial court to determine what constitutes an abuse of prosecutorial discretion. *Muroski, supra* (Spaeth, J. concurring and dissenting).

Everything will depend on the particular facts of the case and the district attorney's articulated reasons for acting, or failing to act, in the particular circumstances. For example, a court [might] find [an abuse] of discretion in a district attorney's pattern of discriminatory prosecution, or in retaliatory prosecutions based on personal or other impermissible motives. Similarly, a district attorney [might] be found to have...abused his discretion for his blanket refusal to prosecute for violations of a particular statute or for refusing to prosecute solely because the accused is a public official.

The fact that it is difficult to define...abuse of discretion does not, however, relieve the court from the obligation to undertake a definition.

*Id.* at 1322–23.[8]

¶ 19 Under Rule 506 and settled case law, the private criminal complainant

---

8. Other examples of an abuse of discretion in these kinds of cases include circumstances involving the deliberate use of race, religion, gender, or other suspect classifications, or biased generalized personal beliefs, such as a belief that a man could never be the victim of domestic violence. Additionally, an abuse of discretion might be found where the complainant can demonstrate a district attorney's pattern or practice of refusing to prosecute certain individuals or groups because of favoritism or cronyism. This list is not meant to be exhaustive, but only to give some indica-

has no right to an evidentiary hearing in connection with the trial court's review of the district attorney's decision to disapprove the private criminal complaint. *Michaels v. Barrasse*, 452 Pa.Super. 325, 681 A.2d 1362, 1365 (1996); *Wood, supra; Commonwealth v. Eisemann*, 276 Pa.Super. 543, 419 A.2d 591 (1980); *Piscanio, supra*. Rule 506 merely allows the private criminal complainant the opportunity to have his complaint reviewed in the Court of Common Pleas, following the district attorney's adverse decision. *Id.*

¶ 20 Our Supreme Court articulated the proper standard of review for the **trial court** in policy-declination cases under Rule 506 as follows:

[A] trial court should not interfere with a prosecutor's policy-based decision to disapprove a private criminal complaint absent a showing of bad faith, fraud, or unconstitutionality.

*Brown II, supra* at 588, 708 A.2d at 84. Although the Supreme Court agreed the correct standard of review for the trial court was one involving deference, absent a showing of bad faith, fraud, or unconstitutionality, the Court did not agree on the definition of "bad faith" or the appropriate application of the "bad faith" standard in

that particular case. *See id.* Notably, the Supreme Court did not address the proper standard and scope of review for the appellate court, which constituted a key debate in the Superior Court's *Brown I* decision.[9] *Id.*

¶ 21 Since the *Brown I* and *II* decisions, we have continued to wrestle with a working definition of the appellate role in this specialized area, in a valiant effort to harmonize what appears to be a divergence in the law with respect to appellate review. *See Owens, supra* at 175 (stating: "[O]ur review on appeal [from the disapproval of a private criminal complaint] is limited to determining whether the trial court abused its discretion or committed an error of law"); *Adams, supra* at 579 (stating: "On appeal, this [C]ourt is limited to determining whether the trial court abused its discretion"); *Cooper, supra* at 80 (citing *Brown I, supra*) (stating: "When an appeal is brought from a common pleas court's decision regarding the approval or disapproval of a private criminal complaint, an appellate court is limited to ascertaining the propriety of the trial court's actions. Thus, our review is limited to determining whether the trial court abused its discretion or committed an error of

---

tion of what might constitute an abuse of discretion in policy-declination cases.

9. In the long history of private criminal complaint cases, *Brown I* was the first case in which this Court distinguished between the trial court's review process and the appellate court's review process. Prior to *Brown I*, the appellate courts routinely exercised plenary review including direct review of the prosecutor's decision and supporting rationale as well as the trial court's decision. *See Benz, supra; Muroski, supra; Metzker, supra; Maloney, supra; Jury, supra; Wood, supra; Malloy, supra; Eisemann, supra; Piscanio, supra*. The major dispute in most cases preceding *Brown I* was whether and under what circumstances the private criminal complainant had standing to appeal from the trial court's decision.

In *Jury*, the appellant specifically asked this Court to decide if the prosecutor had applied the proper legal standard in assessing and disapproving the private criminal complaint at issue. *Id.* at 166. Following our Supreme Court in *Benz, supra*, and consistent with prevailing law, the *Jury* Court proceeded with plenary review, because the issue presented was a pure question of law. Without regard to the special circumstances involved in *Jury*, however, *Brown I* took issue with the *Jury* approach. By implication, *Brown I* also called into question most of the prior precedent in private criminal complaint cases. Nevertheless, we note the Supreme Court in *Brown II* exercised a plenary scope of review in both its opinion in support of affirmance and its opinion in support of reversal.

law"); *Hearn v. Myers,* 699 A.2d 1265, 1267 (Pa.Super.1997) (citing *Brown I, supra*) (stating same); *Michaels, supra* at 1364 (citing *Brown I, supra*) (stating same); *Commonwealth v. McGinley,* 449 Pa.Super. 130, 673 A.2d 343 (1996) (*en banc*) (plurality) (citing *Brown I, supra*) (stating same). We again confront the same dilemma in the present case; *i.e.,* what is the appropriate role of the appellate court, as defined by its standard and scope of review, in private criminal complaint cases.

▮ ¶ 22 Consistent with established Pennsylvania law in general, we now hold that when the district attorney disapproves a private criminal complaint **solely** on the basis of legal conclusions, the trial court undertakes *de novo* review of the matter. Thereafter, the appellate court will review the trial court's decision for an error of law. As with all questions of law, the appellate standard of review is *de novo* [10] and the appellate scope of review is plenary.[11] *See, e.g., Chester Water Authority v. Pennsylvania Public Utility Com'n,* 581 Pa. 640, 648, n. 9, 868 A.2d 384, 2005 WL 424932 n. 9 (2005) (involving matter of statutory interpretation to determine whether PUC committed error of law as question of law, subject to *de novo* standard of review and plenary scope of review); *Commonwealth v. Bradley,* 575 Pa. 141, 834 A.2d 1127 (2003) (involving matter of statutory construction which is pure question of law, subject to *de novo* standard of review and plenary scope of review); *In re Hickson, supra* (Supreme Court) (addressing issue of whether private criminal complainant had standing to seek judicial review of district attorney's

disapproval of private criminal complaint as question of law, subject to *de novo* standard of review and plenary scope of review); *In re T.J., supra* at 124, 739 A.2d at 481 (addressing issue of standing as question of law, subject to error of law/ abuse of discretion standard of review and plenary scope of review); *Commonwealth v. Nester,* 551 Pa. 157, 709 A.2d 879 (1998) (addressing issue of whether confession was voluntary as question of law, subject to *de novo* standard of review and plenary scope of review) (citing cases); *Commonwealth v. Viglione,* 842 A.2d 454 (Pa.Super.2004) (*en banc*) (addressing issue of whether manifest injustice exception to "law of the case" doctrine as question of law, subject to *de novo* standard of review and plenary scope of review); *Commonwealth v. Sow,* 860 A.2d 154 (Pa.Super.2004) (addressing issue of whether federal law preempted prosecution as question of law, subject to *de novo* standard of review and plenary scope of review); *Commonwealth v. John,* 854 A.2d 591 (Pa.Super.2004) (addressing issue of whether court had jurisdiction to prosecute for solicitation based on out-of-state conduct as question of law, subject to *de novo* standard of review and plenary scope of review); *Commonwealth v. Kowalski,* 854 A.2d 545 (Pa.Super.2004) (involving matter of statutory construction which is pure question of law subject to *de novo* standard of review and plenary scope of review); *Commonwealth v. Marti,* 779 A.2d 1177 (Pa.Super.2001) (analyzing issue of whether Commonwealth established *prima facie* case as question of law, subject to *de novo* standard of review and plenary scope of review).

---

**10.** An appeal *de novo* is one "in which the appellate court uses the trial court's record but reviews the evidence and law without deference to the trial court's rulings." Black's Law Dictionary 94 (7th ed. 1999).

**11.** Plenary, in the context of judicial review, means full, complete review of the entire record to the extent necessary. *See* Black's Law Dictionary 1175 (7th ed. 1999).

¶ 23 We further hold that when the district attorney disapproves a private criminal complaint on wholly policy considerations, or on a hybrid of legal and policy considerations, the trial court's standard of review of the district attorney's decision is abuse of discretion. This deferential standard recognizes the limitations on judicial power to interfere with the district attorney's discretion in these kinds of decisions.

¶ 24 The private criminal complainant has the burden to prove the district attorney abused his discretion, and that burden is a heavy one. In the Rule 506 petition for review, the private criminal complainant must demonstrate the district attorney's decision amounted to bad faith, fraud or unconstitutionality. The complainant must do more than merely assert the district attorney's decision is flawed in these regards. The complainant must show the facts of the case lead only to the conclusion that the district attorney's decision was patently discriminatory, arbitrary or pretextual, and therefore not in the public interest. In the absence of such evidence, the trial court cannot presume to supervise the district attorney's exercise of prosecutorial discretion, and should leave the district attorney's decision undisturbed.

¶ 25 Thereafter, the appellate court will review the trial court's decision for an abuse of discretion, in keeping with settled principles of appellate review of discretionary matters. *See Commonwealth v. Hunt*, 858 A.2d 1234 (Pa.Super.2004) (*en banc*) (citing *Commonwealth v. Jones*, 826 A.2d 900, 907 (Pa.Super.2003) (*en banc*)) (stating: "An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias, or ill will, as shown by the evidence or the record, discretion is

abused"). *See also Commonwealth v. Ruby*, 838 A.2d 786 (Pa.Super.2003).

¶ 26 The district attorney's decision not to prosecute a private criminal complaint for reasons including policy matters carries a presumption of good faith and soundness. *See McGinley, supra.* The complainant must create a record that demonstrates the contrary. Thus, the appropriate scope of review in policy-declination cases is limited to whether the trial court misapprehended or misinterpreted the district attorney's decision and/or, without legitimate basis in the record, substituted its own judgment for that of the district attorney. We will not disturb the trial court's decision unless the record contains no reasonable grounds for the court's decision, or the court relied on rules of law that were palpably wrong or inapplicable. Otherwise, the trial court's decision must stand, even if the appellate court would be inclined to decide the case differently.

¶ 27 In the instant case, Appellant submitted his private criminal complaint for prosecution. Prior to ruling on the complaint, the District Attorney ordered an investigation of Appellant's allegations. Upon disapproving the complaint, the District Attorney issued a document which stated:

> Prior to ruling on the attached Private Criminal Complaint, Erie County Detective Joseph Spusta conducted a thorough investigation including but not limited to the following, which was personally reviewed by the Attorney for the Commonwealth, District Attorney Bradley H. Foulk;
>
> 1.  Any and all medical reports including Saint Vincent's Health Center, private medical practitioners reports and X-rays;
>
> 2.  Written and video-taped statements of Erie Bureau of Police Officers An-

thony DeBracco, Patrolman Rick Lorah, Sgt. J.C. Hunter, Officer Robert K. Borland, Sgt. Bruce Casale, Patrolman Adam Gratti, [Lt.] Robert Johns, Jr., and Chief Charles Bowers, Jr.;

3. Written statement of Robert Moyer, Supervisor—Communications Center;

4. Booking Records for John D. Wilson II;

5. Radio transmissions during the relevant period of time;

6. Video-taped statements of the following civilians, Bryan Greene, Patrick J. Wisinski, Chris K. Miller;

7. Press release prepared by the Erie Bureau of Police;

8. Report prepared by Detective Joseph Spusta;

9. Report prepared by Lt. D.J. Fuhrman;

10. Applicable law relating to criminal offenses of simple assault, official oppression, and recklessly endangering;

11. "Super soaker" guns in question;

12. Supporting Affidavit of John Wilson II.

Despite the fact than an anonymous witness claimed to have some knowledge regarding this incident, the Commonwealth was unable to locate said witness who was interviewed by the Erie Times News, despite the Commonwealth's public request that any and all persons having knowledge of this incident come forward to be interviewed. It should be noted that the alleged incident took place on August 10, 2002, at approximately 12:30 a.m., and a formal referral, by way of a Private Criminal Complaint to the District Attorney's Office was filed with District Justice Paul Urbaniak on September 26, 2002. Consequently, the investigation conducted by the District Attorney's Office was done approximately six weeks after the incident oc-

curred. The Commonwealth did not let the delay in the filing of the Private Criminal Complaint in anyway influence its decision.

Based upon an exhaustive review of the available evidence, the Commonwealth exercises its discretion and disapproves the filing of the attached Private Criminal Complaint for the following reasons:

a. Commonwealth is not inclined to commit the prosecution resources of this office inasmuch as the likelihood of a conviction is minimal, if non-existent, and/or there is an extreme likelihood of acquittal if continued further;

b. The victim in this case, if so inclined, has a more than adequate civil remedy available to him for any personal injury or pecuniary loss incurred by him. It should be noted that the Commonwealth fails to see even a *prima facie* showing of a nasal fracture in this case.

(Appellant's Petition for Approval of Private Criminal Complaint, Exhibit "A" dated 10/17/02; R.R. at 19a–20a). In Appellant's Rule 506 petition, Appellant insisted his complaint, along with his medical records and affidavit, should be approved because he set forth a *prima facie* case against Chief Bowers. In his brief in support of approval, Appellant stated: (1) whether he had actually sustained a nasal fracture was irrelevant; (2) the District Attorney "was making excuses for not wanting to charge the Chief of Police with a crime even though [he] engaged in criminal activity"; and (3) "whether or not the medical records that are attached hereto, and that were presented to [District Attorney] Foulk, present a *prima facie* showing of any nasal fracture, and whether or not [Appellant] has an adequate civil remedy are simply not factors that should be considered in determining whether or not Mr.

Bowers, under the circumstances then and there existing..., acted in such a way that he illegally assaulted the petitioner." (Appellant's Brief in Support of Petition for Approval of Private Criminal Complaint, filed 11/14/02, at 6–7; R.R. at 54a–55a). Appellant concluded these considerations rendered the District Attorney's disapproval "suspect," and the trial court must engage in a *de novo* review of the entire matter. (*Id.* at 12; R.R. at 60a).

¶ 28 In response to Appellant's petition and in support of its judgment to defer to the District Attorney's decision, the trial court reasoned as follows:

> This [c]ourt finds the District Attorney's rationale for disapproving the private criminal complaint to be a hybrid of legal and policy reasons. The District Attorney's first basis for disapproving the private criminal complaint—that the likelihood of conviction is minimal and/or the likelihood of acquittal is great—indicates a lack of prosecutorial merit. This is a policy determination. *See [Metzker, supra]* ([stating] [w]here the District Attorney concludes, based on investigation, that a conviction is doubtful or impossible, discretion can and should be exercised to refuse approval). Likewise, the determination that the victim has adequate civil remedies available to him is a policy reason for refusing to prosecute the complaint. *See Cooper, supra* ([stating] [t]he availability of adequate civil remedies is a policy reason for denial).
>
> [Appellant] asserts that his private criminal complaint was improperly denied despite the fact that there was *prima facie* evidence of the crimes of assault, reckless endangerment, and official oppression. [Appellant] argues that where a *prima facie* case can be established, the district attorney is required to prosecute the case, even if he believes justification or excuse may ultimately result in

an acquittal. *See [Benz, supra].* Thus, he argues that the District Attorney may not disapprove a private complaint merely because it lacks prosecutorial merit.

> In the instant case, District Attorney Foulk noted that there did not appear to be a *prima facie* showing of a nasal fracture. As [Appellant] correctly points out there does not need to be any evidence of a fracture to support a claim of assault.... Furthermore, the [c]ourt notes that the medical records do support [Appellant's] claim that he suffered bodily injury. However the inquiry does not end there. The [c]ourt does not agree with [Appellant's] assertion that where there is *prima facie* evidence that a crime has been committed the District Attorney is required to approve a private criminal complaint.

> The [c]ourt finds *Benz* to be distinguishable from the case at bar. In *Benz,* the district attorney declined to prosecute the case on the basis that there was insufficient evidence to establish that a crime had been committed. The prosecutor in *Benz* did not cite any other reasons for declining to prosecute the case. In the instant case, District Attorney Foulk cited two policy reasons for disapproving the complaint. He specifically stated that the likelihood of a conviction in this case is minimal. Where the District Attorney concludes, based on investigation, that a conviction is doubtful or impossible, discretion can and should be exercised to refuse approval even where the complaint sets forth facts sufficient to state a *prima facie* case. *See Metzker, supra.*

> The [c]ourt finds that [Appellant's] private complaint was denied for a hybrid of policy and legal reasons. Accordingly, the [c]ourt reviewed the disapproval for an abuse of discretion. *See Cooper,*

*supra.* The [c]ourt finds no abuse of discretion in District Attorney Foulk's decision not to approve the private complaint. District Attorney Foulk has set forth two valid policy reasons for disapproving [Appellant's] private complaint. There is no evidence of bad faith, fraud or unconstitutionality. This [c]ourt cannot and will not interfere with the District Attorney's decision to disapprove the complaint.

(Trial Court Opinion at 5–7). We accept the trial court's analysis. Absent more, this case does not demonstrate an abuse of discretion by the trial court. Appellant's allegation of bad faith in his petition is based only on suspicion, and suggests partiality or favoritism without factual support. On this record, we do not see how the trial court could, from a single incident, extrapolate a pattern of police brutality that routinely goes unchecked or a breach by the District Attorney of his duty to protect the public interest.

¶ 29 Moreover, we reject Appellant's contention that the trial court should have engaged in *de novo* review of the District Attorney's decision, even though his decision directly implicated policy considerations. Appellant's contention conflicts with established Pennsylvania precedent. *See Cooper, supra; Metzker, supra.* Here, the District Attorney disapproved Appellant's private criminal complaint for mixed reasons of law and policy. The trial court correctly applied due deference to that decision, in recognition of the District Attorney's duty to conserve and devote the resources of his office to cases in which there is a likelihood of a conviction.

¶ 30 Based upon the foregoing, we hold Appellant has standing to appeal the trial court's order sustaining the District Attorney's disapproval of Appellant's private criminal complaint. Consistent with established Pennsylvania law, we further hold

that when the district attorney disapproves a private criminal complaint solely on the basis of legal conclusions, the trial court undertakes *de novo* review of the matter. Thereafter, the appellate court will review the trial court's decision for an error of law. As with all questions of law, the appellate standard of review is *de novo* and the appellate scope of review is plenary.

¶ 31 Additionally, we hold that when the district attorney's decision to disapprove a private criminal complaint involves policy considerations, the trial court's standard of review of the district attorney's decision is abuse of discretion. The private criminal complainant has the burden to prove the district attorney abused his discretion, and that burden is a heavy one. The complainant must do more than merely assert the district attorney's decision is flawed in these regards. The complainant must show the facts of the case lead only to the conclusion that the district attorney's decision was patently discriminatory, arbitrary or pretextual, and therefore not in the public interest. In the absence of such evidence, the trial court cannot presume to supervise the district attorney's exercise of prosecutorial discretion, and the district attorney's decision will be left undisturbed. Thereafter, the appellate court will review the trial court's decision for an abuse of discretion, in keeping with settled principles of appellate review of discretionary matters. The appropriate scope of appellate review in policy-declination cases is limited to whether the trial court misapprehended or misinterpreted the district attorney's decision and/or, without legitimate basis in the record, substituted its own judgment for that of the district attorney. Thus, we will disturb the trial court's decision only if there are no reasonable grounds for the court's decision, or the court relied on rules of law that were

palpably wrong or inapplicable. Otherwise, the trial court's decision must stand, even if the appellate court would be inclined to decide the case differently.

¶ 32 Applying the proper standard and scope of appellate review as enunciated in this case, we conclude that Appellant failed to demonstrate an abuse of discretion by the trial court, when it deferred to the District Attorney's decision to disapprove Appellant's private criminal complaint. Accordingly, we affirm.

¶ 33 Order affirmed.

¶ 34 Judge KLEIN joins the majority and files a concurring statement.

¶ 35 Judge BENDER files a dissenting opinion.

¶ 36 Judge BOWES files a dissenting statement in which BENDER, J. joins.

KLEIN, J., Concurring:

¶ 1 I join in the decision and analysis of the majority. I write separately to note that I agree with the dissent that sometimes it will be the obligation of this Court to review the entire record to determine whether the prosecutor abused his or her discretion in refusing to bring a private criminal complaint. In some circumstances it will be necessary for this Court to conduct an *in camera* review of all the documents reviewed by the prosecutor and the trial court to make that determination. In this case, however, I agree with the majority that we can make the determination without seeing all the documents. The known facts and stated rationale of the prosecutor justify the decision to deny prosecution.

¶ 2 As was pointed out in the thorough and scholarly opinion by the majority, the trial court must defer to the district attorney's decision to refuse prosecution and the private criminal complainant has a heavy burden to show an abuse of discretion.

¶ 3 In this case, the alleged victim started the episode by shooting an innocent pedestrian with the powerful stream of a "Super Soaker," and where there was no firm evidence of any serious injury, there was a question as to whether the victim suffered a broken nose. As is obvious, the complainant picked the wrong victim. It is clear that the District Attorney did not make a snap judgment, but reviewed the entire case thoroughly. Even without reviewing all those documents ourselves, since the victim started the incident and suffered no major injuries, we can determine that it would be very difficult to get a conviction. It was not an abuse of discretion for the prosecutor to refuse to commit what would likely be significant resources on a losing case. Likewise, the victim does have the remedy of a civil action, possibly a federal section 1983 action.[12] Therefore, based on what we know, there was no abuse of discretion.

¶ 4 It might be optimum to review all the documents upon which the District Attorney relied. While I agree with the dissent that in some cases it will be necessary to review all that the trial judge saw, I agree with the majority that this is not one of those cases.

BENDER, J., Dissenting.

¶ 1 I agree with my colleagues in the Majority that Appellant has standing to appeal the order under review;[13] however, given the state of the record before this Court, I would conclude that review of the order in question on the record before us is meaningless.

---

12. 42 U.S.C. § 1983.

13. See Majority Opinion at 218.

¶ 2 In deciding whether to approve the private complaint, the District Attorney's office was privy to an extensive amount of material. As the Majority points out, the District Attorney, upon disapproving the private complaint, issued a document which provided the following:

Prior to ruling on the attached Private Criminal Complaint, Erie County Detective Joseph Spusta conducted a thorough investigation including but not limited to the following, which was personally reviewed by the Attorney for the Commonwealth, District Attorney Bradley H. Foulk;

1. Any and all medical reports including Saint Vincent's Health Center, private medical practitioners reports and X-rays;

2. Written and video-taped statements of Erie Bureau of Police Officers Anthony DeBracco, Patrolman Rick Lorah, Sgt. J.C. Hunter, Officer Robert K. Borland, Sgt. Bruce Casale, Patrolman Adam Gratti, [Lt.] Robert Johns, Jr., and Chief Charles Bowers, Jr.;

3. Written statement of Robert Moyer, Supervisor—Communications Center;

4. Booking Records for John D. Wilson II;

5. Radio transmissions during the relevant period of time;

6. Video-taped statements of the following civilians, Bryan Greene, Patrick J. Wisinski, Chris K. Miller;

7. Press release prepared by the Erie Bureau of Police;

8. Report prepared by Detective Joseph Spusta;

9. Report prepared by Lt. D.J. Fuhrman;

10. Applicable law relating to criminal offenses of simple assault, official oppression, and recklessly endangering;

11. "Super soaker" guns in question;

12. Supporting Affidavit of John Wilson II.

Despite the fact than an anonymous witness claimed to have some knowledge regarding this incident, the Commonwealth was unable to locate said witness who was interviewed by the Erie Times News, despite the Commonwealth's public request that any and all persons having knowledge of this incident come forward to be interviewed. It should be noted that the alleged incident took place on August 10, 2002, at approximately 12:30 a.m., and a formal referral, by way of a Private Criminal Complaint to the District Attorney's Office was filed with District Justice Paul Urbaniak on September 26, 2002. Consequently, the investigation conducted by the District Attorney's Office was done approximately six weeks after the incident occurred. The Commonwealth did not let the delay in the filing of the Private Criminal Complaint in anyway influence its decision.

Majority Opinion at 215–16.

¶ 3 After becoming aware of all of the materials relied on by the District Attorney to arrive at a decision, Appellant filed a motion requesting permission to inspect the District Attorney's file. Reproduced Record at 44–47. Said motion was denied by the trial court. Reproduced Record at 48. However, the trial court did issue an order directing that the items reviewed by the District Attorney be provided to the trial court for its review. Reproduced Record at 43.

¶ 4 While it would seem that supplying the trial court with the items in question could constitute an ex parte communication between the District Attorney and the court, there are situations when ex parte communications are permissible. However, the problem that now presents itself, and which I do not believe the Majority

addresses, is how are we to conduct any meaningful review of the trial court's actions if we do not have the information upon which the trial court based its decision?

¶ 5 We recognize that we cannot blame the state of the record on Appellant, since Appellant does not have and has not been given access to the materials in question. *See* Denial of Appellant's Motion for Inspection, Reproduced Record at 48, Appellant's brief at 4.

¶ 6 The majority concludes,

The private criminal complainant has the burden to prove the district attorney abused his discretion, and that burden is a heavy one. The complainant must do more than merely assert the district attorney's decision is flawed in these regards. The complainant must show the facts of the case lead only to the conclusion that the district attorney's decision was patently discriminatory, arbitrary or pretextual, and therefore not in the public interest. In the absence of such evidence, the trial court cannot presume to supervise the district attorney's exercise of prosecutorial discretion, and the district attorney's decision will be left undisturbed.

Majority Opinion at 218.

¶ 7 To say that the private criminal complainant has a heavy burden is at best an understatement. How can such a heavy burden be met when the complainant has no idea of the facts upon which the trial court based its decision. How can the complainant do more than make mere assertions without the benefit of the record relied upon by the trial court. And how possibly can the complainant show the facts of the case lead anywhere when the complainant is not permitted to see the facts in question. Under this procedure, a complainant can never prevail.

¶ 8 I feel bound at this point to further note that it seems that in our rush to give the District Attorney and the trial court unchecked discretion, we have lost sight of the complainant's version of the facts. Attached to the private criminal complaint is a set of facts which differ significantly from the facts the trial court set forth. See Majority Opinion at 203 and 204.

¶ 9 The complainant's version of the facts are as follows:

1. On the date, and at the time and place listed aforesaid, I was a passenger in a vehicle traveling east on East 14th Street. As we passed the Intersection of East 14th and French Streets and proceeded toward Holland Street, the driver of our vehicle pulled the vehicle to the right side of the road because we were being pursued by the defendant, Charles Bowers and a City of Erie Police cruiser was approaching us with its lights flashing. As we pulled to the side of the road, he put it in park, took the keys out of the ignition, placed them on the dashboard, and put his hands on the steering wheel. When I saw him doing this, I put my hands on my knees, at which time Charles Bowers, who was off-duty at the time, approached the vehicle and punched me in the nose through the open passenger-side car window.

2. Immediately after punching me, Mr. Bowers started directing profanities at me and the other three occupants of the vehicle and stated "You f...ed with the wrong m.....f...er. I'm the God....n Chief of Police."

3. Mr. Bowers then opened the passenger side door and removed me from the vehicle by grabbing my arm, twisting it behind my back, and pulling me out of the vehicle;

4. Once I was outside of the vehicle with my arm twisted behind me, Mr.

Bowers grabbed a chain that I was wearing around my neck and proceeded to lift me, by the chain and the belt on my pants, above the passenger door, at which time he violently threw my body on to the roof of the vehicle;

5. While my head and the upper part of my body were lying on the roof of the vehicle, Mr. Bowers grabbed the chair around my neck, jerked it toward himself and asked me if I was a f. . .ing dog;

6. Mr. Bowers then proceeded to pull me off the roof of the vehicle on to the ground. He then took me to the back of the vehicle and threw me on to the trunk of the car at which time I was handcuffed and led into a City of Erie Police cruiser and taken to the Erie Police Station for booking and arrest. I was ultimately released at approximately 2:45 a.m.

7. At no time from the moment that our vehicle pulled to the side of the road did I, or any of the passengers in the vehicle in which I was riding, in any way make any type of movement toward Mr. Bowers or any of the other police officers. In addition, no one made any movements inside of the vehicle and no one made any statements directed at Mr. Bowers or the other officers.

Reproduced Record at 5a and 6a.

¶ 10 What we have are allegations that the Chief of Police of Erie punched the complainant in the nose then forcibly removed the complainant from the vehicle and lifted the complainant by a chain on his neck and his belt and threw him onto the roof of the vehicle. He then asked him if he was a fucking dog and pulled him to the ground. He then threw him onto the trunk of the vehicle. While doing this, the Chief of Police was uttering profanity, "You fucked with the wrong motherfucker. I'm the God dam Chief of Police." This was allegedly done in front of uniformed

City of Erie Police Officers and other civilians. Would it not impact our decision in this case to see the written and video-taped statements of the police officers who witnessed this episode? Why was complainant not simply arrested by the uniformed police officers on the order of the chief? Would it not be helpful in our decision making to see the video-taped statements of the civilian witnesses? The District Attorney saw these statements, as did the trial court. However, the complainant, who has that heavy burden, was not permitted to see these statements. We who in theory review the trial courts decision have not seen these statements.

¶ 11 Does this not seem peculiar? The complainant who has the heavy burden to show that the facts of the case lead to a conclusion, is not permitted to see the facts. That we the appellate court, reviewing the trial court decision, do not have the facts before us upon which we would base a decision. Have we gone through the looking glass? Are we in wonderland?

¶ 12 Does it not seem that the Chief of Police would want vindication of his reputation by a court finding his version of the facts to be the truth, or do we not need such court intervention? Is it permissible for a plain clothes Chief of Police to beat the complainant in front of uniformed police officers and civilians for no purpose other than he is angry? Do we not have allegations of police brutality and abuse of office which constitute serious questions requiring resolution for the public good? How will this review process leave the public feeling? If it is O.K. for a Police Chief to beat someone who displeased him, is such action permitted by ordinary citizens?

¶ 13 Should not the facts of this case be determined in open court with the public looking on, rather than in a process resembling a star chamber? What good comes

from secreting the facts from our court? Could the answer be that we will make the wrong decision with the facts, but will make the right decision without the facts? If we are not going to review the decision of the trial court, why not so state? To say there is no review of the trial court is preferable to a pretend review without the facts.

¶ 14 To conduct review on the state of the record as it presently exists is to conduct no review whatsoever. It is our responsibility to review the complete record using a proper standard of review. I would propose that the "missing" record be sealed and supplied to our Court so as to permit a meaningful review.

BOWES, J., Dissenting:

¶ 1 In the present case, the prosecutor's decision not to prosecute rested on three rationales, as outlined on page four of the majority's decision. First, the district attorney concluded that the likelihood of a conviction was minimal, which constituted a legal evaluation of the evidence and is subject to appellate *de novo* review. *Commonwealth v. Benz*, 523 Pa. 203, 565 A.2d 764 (1989) (per three justices with one justice concurring in this result). The district attorney also stated a purported policy decision not to commit its resources to prosecution, but that decision rested solely on its conclusion that the case was one where the likelihood of conviction was slight. Therefore, this policy decision holds weight only if the legal evaluation of

the evidence is correct. The third reason stated, which is that Appellant had an adequate civil remedy, is not supportable as a "policy" decision because the victim of a crime can always bring a civil action. The district attorney's office simply cannot support this reason as an articulated policy because if such a policy drove its decisions as to whether to prosecute, no cases would be prosecuted.[14] *See Commonwealth v. Brown*, 550 Pa. 580, 708 A.2d 81 (1998) (evaluation of purported policy reasons for not prosecuting).

¶ 2 Hence, I believe that the foundation of the decision herein rested solely upon a legal evaluation of the evidence and that, in order to properly review that decision, we should examine the evidence used by the district attorney during his assessment. The record does not presently contain that evidence, and we should order its inclusion therein.

14. The fact that a single act or acts can give rise to both civil and criminal sanctions reflects the fact that two different interests are being protected. Theoretically speaking, recovery in a civil action addresses the affront against the person and is designed to make the injured party "whole." Conversely, prosecution in criminal court is designed to address the affront to the sovereign and the citizens of the Commonwealth. This princi-

ple is reflected in the following quote from the United States Supreme Court, "[t]he dual sovereignty doctrine is founded on the common-law conception of crime as an offense against the sovereignty of the government." *Heath v. Alabama*, 474 U.S. 82, 88, 106 S.Ct. 433, 437, 88 L.Ed.2d 387, 394 (1985). While Appellant's injury to his person can be redressed by a civil action, a civil action does nothing to redress the affront to the Commonwealth.