J-A16035-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF S.Y., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: T.S., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 241 MDA 2021 |

Appeal from the Order Entered January 19, 2021
In the Court of Common Pleas of Lebanon County Orphans' Court at
No(s):  2019-407

BEFORE:   KUNSELMAN, J., McCAFFERY, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:          **FILED SEPTEMBER 21, 2021**

Appellant, T.S. ("Biological Mother"), files this appeal from the Order dated January 15, 2021, and entered January 19, 2021, in the Lebanon County Court of Common Pleas declining to: approve immediately a Post-Adoption Contact Agreement ("PACA") pursuant to 23 Pa.C.S.A. § 2735; enforce immediately the PACA pursuant to 23 Pa.C.S.A. § 2738 and; declare the PACA null and void as to her biological son, S.Y. ("Child").[1,2]  After review, we quash Biological Mother's appeal.

---

[*] Former Justice specially assigned to the Superior Court.

[1] Upon adoption, Child's name was changed to J.S.  Notes of Testimony ("N.T."), 6/16/20, at 70; Decree, 9/10/19, at ¶ 2.

[2] The trial court's Order pertained to the PACA as to both Biological Mother and Child's biological grandmother, R.S. ("Biological Maternal Grandmother"). Notably, Biological Maternal Grandmother did not file a separate appeal.  She
*(Footnote Continued Next Page)*

The trial court summarized the relevant factual history as follows:

[Child] was born [in July 2013]. He lived for about four (4) months with [his biological mother and father].[3] On December 17, 2013, [Child] was hospitalized with intercranial bleeding, subdural hemorrhage, subarachnoid hemorrhage and significant bilateral retinal hemorrhage. Court-appointed expert Virginia Murphy stated that [Child] suffered "abusive head trauma secondary to shaken baby syndrome." [Child]'s injuries were life-threatening.

[Child] remained hospitalized between December 17, 2013 and January 1, 2014. He was then transferred to a rehabilitation facility, where he remained until February 12, 2014. Because of the abusive nature of [Child]'s injuries, Delaware County Children and Youth Services (Delaware CYS) took emergency custody of [Child]. Eventually, Delaware CYS "indicated" findings of the abuse against both [Child's biological mother and father].

On February 12, 2014, Delaware CYS placed [Child] in foster care with [A.S. ("Adoptive Mother")] following his release from the Penn State Children's Rehabilitation Hospital. According to an April 11, 2019 Intermediary Report, Delaware CYS chose not to place [Child] with his maternal grandparents "due to his needs being too overwhelming for them." For about four (4) years, [Child] remained in the custody of [Adoptive Mother]. However, the official Delaware CYS plan for [Child] remained reunification with his [biological] mother.

During mid-2018, Delaware CYS changed its goal plan for [Child] from reunification to adoption. . . .

The Delaware County Court of Common Pleas scheduled a hearing regarding termination of parental rights for October 26, 2018. [Child's biological father] neither appeared nor contested the termination of his rights. However, [Biological Mother] and her mother, [Biological Maternal Grandmother,] did appear and expressed a desire to oppose the termination of [Biological

_____

did, however, submit a brief to this Court in favor of enforcement of both PACAs executed in this matter.

[3] Child's biological father, R.Y., is not a participating party to the instant appeal.

Mother]'s rights. . . . An agreement was brokered that [Adoptive Mother] could proceed with the adoption. However, both [Biological Mother] and [Biological Maternal Grandmother] would retain the ability to have post-adoption contact with [Child].

On October 26, 2018, [Adoptive Mother] and [Biological Mother] entered a voluntary [PACA]. [Adoptive Mother] also entered a similar agreement with [Biological Maternal Grandmother]. Both of the agreements called for continuing contact between [Child] and his biological family. However, both agreements also contained the following language:

> "If at any time a mental health professional who is providing services to [Child] advises a change in the visitation, then the visits according to this agreement will occur in accordance with any recommendations made by that mental health professional who is treating [Child]."
> (Paragraph 4(j) of agreement.)

On the same date the [PACA] was signed, the Delaware County Court of Common Pleas entered a decree of voluntary relinquishment. Custody of [Child] was remanded to Delaware CYS pending an adoption. The decree authorized Delaware CYS to give consent to the adoption of [Child] "without further consent of or notice to the aforesaid parent."

There was a disagreement about whether the [PACA] was presented to the Delaware County Court. Both [Biological Mother] and [Biological Maternal Grandmother] testified that the Delaware County Court received and approved the [PACA]. [Adoptive Mother] denied that this occurred.[4] Nothing in any of the documents provided by the Delaware County Court to Lebanon County included the [PACA] or any reference to it.

---

[4] Adoptive Mother testified, similarly to Biological Mother and Biological Maternal Grandmother, that the PACAs were approved by the court that handled the termination proceedings and terminated parental rights. N.T., 6/16/20, at 80. Adoptive Mother, however, does not formally argue that the PACAs were approved by either the court that handled the termination proceedings or the court that handled the adoption proceedings and entered the adoption decree.

- 3 -

Between October of 2018 and July of 2019, [Biological Mother] and/or [Biological Maternal Grandmother] had regular contact with [Child]. . . .[5] Problems were reported with some of the visits. During the same time frame, [Child] experienced significant behavioral problems that resulted in his expulsion from public school and near admission to a behavioral health center for children.

During the summer of 2019, [Child]'s primary therapist authored a letter that stated: "As [Child] is still getting stabilized on his medications and learning new interventions along with having therapy session, I feel that regularly scheduled visits and overnight stays with biological parents or members of their family would not be in the best interest at this point in time." ([*See*] Exhibit 14). Thereafter, [Adoptive Mother] stopped the visits of [Biological Mother] and [Biological Maternal Grandmother].

On June 11, 2019, [Adoptive Mother] filed a Report of Intent to Adopt. An Intermediary Report that was approved by Delaware County CYS was filed in the Lebanon County Court on the same date. On August 16, 2019, [Adoptive Mother] followed up by filing a formal Petition for Adoption. No notice of this Petition was given to either [Biological Mother] or [Biological Maternal Grandmother]. A hearing was scheduled by this [c]ourt. On September 9, 2019, this [c]ourt entered a Final Decree of Adoption by which [Adoptive Mother] became the formal official parent of [Child].[6]

Although neither [Biological Mother] nor [Biological Maternal Grandmother] were present at the adoption hearing, [Adoptive Mother] apparently provided information to this [c]ourt about the

---

[5] Biological Mother testified that her last visit with Child was in August 2019. N.T., 6/16/20, at 23. She indicated that she maintained visitation post-termination from October 2018 through August 2019 as scheduled through CYS. *Id.* at 10. Upon learning that the adoption was finalized, Biological Mother emailed Adoptive Mother. *Id.* at 7, 10-11, 71. By email dated September 30, 2019, Adoptive Mother responded that Child's "mental health physician has determined that regularly scheduled visits with biological family is not <u>currently</u> in his best interest." Exhibit 3; *see also* N.T., 6/16/20, at 11, 21.

[6] While dated September 9, 2019, the decree was filed and docketed, and notice provided, on September 10, 2020.

existence of a [PACA]. Although the agreement itself was not marked as an exhibit or introduced in evidence, the [c]ourt stated in its Final Decree that it would retain jurisdiction "in order to address all issues pertaining to a continuing contact agreement with [Child's] birthmother and grandmother."[7]

On January 24, 2020, [Biological Mother] and [Biological Maternal Grandmother] filed Petitions to Enforce the [PACA]. A hearing was scheduled for March of 2020. That hearing was postponed due to a pandemic-necessitated judicial emergency. An initial hearing was eventually conducted on June 16, 2020.

On June 16, 2020, [Adoptive Mother] relied upon the recommendation of [Child]'s primary therapist that no contact occur between [Child] and his biological family. Both [Biological Mother] and [Biological Maternal Grandmother] challenged the credibility of the therapist. They both effectively alleged that the therapist was nothing more than a mouthpiece for [Adoptive Mother]. It became obvious to the [c]ourt that neither [Biological Mother] nor [Biological Maternal Grandmother] would accept any medical or therapeutic report generated at the request of [Adoptive Mother].

This [c]ourt decided to invoke [Pa.R.E.] 706 and appoint an independent therapist to determine whether or to what extent contact between [Child] and his biological family should be facilitated. After some back and forth with counsel, Dr. Virginia Murphy was appointed in July of 2020. The [c]ourt [o]rder appointing Dr. Murphy afforded both parties with the opportunity to request another [c]ourt hearing to accept testimony of Dr. Murphy if her report was not deemed sufficient.

On September 30, 2020, Dr. Murphy authored a report.[8] A request for testimony was presented. On November 3, 2020, this

_____

[7] Decree, 9/10/19, at ¶ 3.

[8] Dr. Murphy's report was not marked and admitted as an exhibit, and it is not included with the certified record; however, it is a part of the reproduced record. As the veracity of this report is not in dispute, we rely on the copy contained within the reproduced record. *See Commonwealth v. Barnett*, 121 A.3d 534, 544 n.3 (Pa.Super. 2015) (stating "While this Court generally may only consider facts that have been duly certified in the record, where the accuracy of a document is undisputed and contained in the reproduced record, we may consider it." ) (citations omitted).

[c]ourt scheduled a hearing on December 21, 2020 in order to afford the parties with the opportunity to directly question Dr. Murphy in [c]ourt. That hearing was conducted as scheduled. . . .[9]

Trial Court Opinion ("T.C.O."), 1/19/21, at 2-7 (footnote omitted).

As stated previously, by order dated January 15, 2021, and entered January 19, 2021, the trial court declined to approve immediately the Post-Adoption Contact Agreement ("PACA") pursuant to 23 Pa.C.S.A. § 2735, declined to enforce immediately the PACA pursuant to 23 Pa.C.S.A. § 2738, and determined it would not declare the PACA null and void. The court further

_____

[9] All parties stipulated to Dr. Murphy's qualifications as an expert therapist. N.T., 12/21/20, at 3. Dr. Murphy opined that ongoing contact between Biological Mother and Child could occur. Notwithstanding, she indicated that it should occur following mediation, whether formal or informal, between Biological Mother and Adoptive Mother. She further recommended that any contact between Biological Mother and Child should occur slowly and at first through means such as FaceTime and telephone. *Id.* at 5-6. Dr. Murphy testified:

> So[,] I believe [Biological Mother] has her son's best interest at heart. I believe that she loves him deeply. I believe that she would do what she can to make it a loving and helpful contact should she have contact. I believe that in order to have contact, it's very important that she and [Adoptive Mother] engage in mediation, whether it's formal or informal, to determine if they can work on the same page and be a team for [Child]. He will need that. He needs all the support he can get given his significant needs. I believe it should occur slowly. Regular contact by phone and Facetime would establish a level of trust and predictability for [Child] and make it much easier for him to continue to build a relationship with his biological mother in years to come.

*Id.*

- 6 -

granted leave to pursue a claim for contact at a future date. Contemporaneously, the court issued an opinion.

Thereafter, on February 17, 2021, Biological Mother filed a timely notice of appeal, as well as a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). On March 3, 2021, the trial court filed an additional opinion incorporating its prior opinion and addressing Biological Mother's constitutional challenges.

On appeal, Biological Mother raises the following issues for our review:

1. Did the trial court improperly deny approval of the parties['] [PACA] when the [PACA] at the time it was signed was acknowledged by the parties to be in the best interest of the child and was filed with the court that finalized the adoption pursuant to 23 Pa.C.S.A. §2735(a, b)?

2. Did the trial court improperly deny enforcement of the [PACA] when the [PACA] was in writing, approved by the court on or before the date for any adoption decree, [Biological Mother] was in substantial compliance of the agreement and enforcement served the best interest of the child under pursuant to 23 Pa.C.S.A. §2738(a-d)?

3. Does the combined requirements under 23 Pa.C.S.A. §2735(a, c); 23 Pa.C.S.A. §2738(c)(2); and 23 Pa.C.S.A. §2521(a) violate [Biological Mother]'s procedural due process rights under Article I, Section I of the Pennsylvania Constitution and the 14th Amendment of the United States Constitution when it places an impossible requirement the [PACA] be approved by the court that finalizes the adoption on or before the date of any adoption decree when the [Biological Mother] has no right to know where or when adoption will occur?

Biological Mother's Brief at 4-5 (suggested answers omitted).

"[T]he interpretation and application of a statute is a question of law that compels plenary review to determine whether the court committed an

error of law." *Wilson v. Transport Ins. Co.*, 889 A.2d 563, 570 (Pa.Super. 2005). "As with all questions of law, the appellate standard of review is *de novo* and the appellate scope of review is plenary." *In re Wilson,* 879 A.2d 199, 214 (Pa.Super. 2005) (*en banc*).

On the topic of statutory interpretation, we have stated:

[We] are constrained by the rules of statutory interpretation, particularly as found in the Statutory Construction Act. 1 Pa.C.S.A. §§ 1501-1991. The goal in interpreting any statute is to ascertain and effectuate the intention of the General Assembly. Our Supreme Court has stated that the plain language of a statute is in general the best indication of the legislative intent that gave rise to the statute. When the language is clear, explicit, and free from any ambiguity, we discern intent from the language alone, and not from the arguments based on legislative history or "spirit" of the statute. We must construe words and phrases in the statute according to their common and approved usage. We also must construe a statute in such a way as to give effect to all its provisions, if possible, thereby avoiding the need to label any provision as mere surplusage.

*Cimino v. Valley Family Medicine*, 912 A.2d 851, 853 (Pa.Super. 2006) (quoting *Weiner v. Fisher*, 871 A.2d 1283, 1285-86 (Pa.Super. 2005)). *See also* 1 Pa.C.S.A. § 1921(b). Under Section 1921(c), the court resorts to considerations of "purpose" and "object" of the legislature when the words of a statute are not explicit. *Sternlicht v. Sternlicht*, 583 Pa. 149, 158, 876 A.2d 904, 909 (2005) (referring to consideration of matters such as: (1) occasion and necessity for statute; (2) circumstances under which it was enacted; (3) mischief to be remedied; (4) object to be attained; (5) former law, if any, including other statutes upon same or similar subjects; (6) consequences of particular interpretation; (7) contemporaneous legislative

history; (8) legislative and administrative interpretations of such statute). *Id.* at 158 n.9, 876 A.2d 909 n.9. Finally, "it is presumed that the legislature did not intend an absurd or unreasonable result. In this regard, we . . . are permitted to examine the practical consequences of a particular interpretation." *Commonwealth v. Diakatos*, 708 A.2d 510, 512 (Pa.Super. 1998).

As to the parties to a post-adoption contact agreement, 23 Pa.C.S.A. § 2733 provides:

> **(a) Prospective adoptive parents and birth relatives.**--A prospective adoptive parent of a child may enter into an agreement with a birth relative of the child to permit continuing contact or communication between the child and the birth relative or between the adoptive parent and the birth relative.
>
> **(b) Guardians ad litem for siblings of adoptees.**--Where siblings have been freed for adoption through the termination of parental rights, following a dependency proceeding, and the prospective adoptive parent is not adopting all of the siblings, each such sibling who is under 18 years of age shall be represented by a guardian ad litem in the development of an agreement.
>
> **(c) Notification.**--An agency or anyone representing the parties in an adoption shall provide notification to a prospective adoptive parent, a birth parent and a child who can be reasonably expected to understand that a prospective adoptive parent and a birth relative of a child have the option to enter into a voluntary agreement for continuing contact or communication.
>
> **(d) Construction.**--Nothing in this chapter shall be construed to prohibit the parties from agreeing to mediation of an agreement at their own cost, including the modification of an agreement, before seeking a remedy from the court.

23 Pa.C.S.A. § 2733.

In addition, 23 Pa.C.S.A. § 2735 states:

**(a) General rule.**--An agreement shall be filed with the court that finalizes the adoption of the child.

**(b) Conditions for approval.**--The court shall approve the agreement if the court determines that:

(1) The agreement has been entered into knowingly and voluntarily by all parties. An affidavit made under oath must accompany the agreement affirmatively stating that the agreement was entered into knowingly and voluntarily and is not the product of coercion, fraud or duress. The affidavit may be executed jointly or separately.

(2) The agreement is in the best interest of the child. In making that determination, factors that the court may consider include, but are not limited to, the following:

(i) The length of time that the child has been under actual care, custody and control of a person other than a birth parent and the circumstances relating thereto.

(ii) The interaction and interrelationship of the child with birth relatives and other persons who routinely interact with the birth relatives and may significantly affect the child's best interests.

(iii) The adjustment to the child's home, school and community.

(iv) The willingness and ability of the birth relative to respect and appreciate the bond between the child and prospective adoptive parent.

(v) The willingness and ability of the prospective adoptive parent to respect and appreciate the bond between the child and the birth relative.

(vi) Any evidence of abuse or neglect of the child.

**(c) Legal effect.**--An agreement shall not be legally enforceable unless approved by the court.

23 Pa.C.S.A. § 2735.

J-A16035-21

Further, 23 Pa.C.S.A. § 2738 provides the following as to the enforcement of such an agreement:

> **(a) General rule.**--Any party to an agreement, a sibling or a child who is the subject of an agreement may seek to enforce an agreement by filing an action in the court that finalized the adoption.
>
> **(b) Remedies.**--Any party to an agreement, a sibling or a child who is the subject of an agreement may request only specific performance in seeking to enforce an agreement and may not request monetary damages or modification of an agreement.
>
> **(c) Requirements.**--For an agreement to be enforceable, it must be:
>
> (1) In writing.
>
> (2) Approved by the court on or before the date for any adoption decree.
>
> (3) If the child is 12 years of age or older when the agreement is executed, the child must consent to the agreement at the time of its execution.
>
> **(d) Prerequisites.**--Before the court may enter an order enforcing an agreement, it must find all of the following:
>
> (1) The party seeking enforcement of the agreement is in substantial compliance with the agreement.
>
> (2) By clear and convincing evidence, enforcement serves the needs, welfare and best interest of the child.
>
> **(e) Cessation of enforceability.**--
>
> (1) An agreement shall cease to be enforceable on the date the child turns 18 years of age unless the agreement otherwise stipulates or is modified by the court.
>
> (2) The court issuing final approval of an agreement shall have continuing jurisdiction over enforcement of the agreement until

- 11 -

the child turns 18 years of age, unless the agreement otherwise stipulates or is modified by the court.

**(f) Exclusivity of remedy.**--This section constitutes the exclusive remedy for enforcement of an agreement, and no statutory or common law remedy shall be available for enforcement or damages in connection with an agreement.

23 Pa.C.S.A. § 2738.

Biological Mother initially argues the trial court erred in analyzing the approval of the PACA because an analysis had been done almost three years prior when the court retained jurisdiction in the adoption decree to address PACA issues. Biological Mother's Brief at 16-17. She maintains all parties agreed at the time of execution that continuing contact was in Child's best interest. *Id.* at 17. Biological Mother further highlights the notarized affidavits indicating the parties entered into the agreement knowingly and voluntarily, and without coercion, fraud or duress. *Id.* Biological Mother states:

> Ultimately it is an abuse of discretion for lower court to engage in an analysis of whether to approve the [PACA] almost three years after it should have done so if in fact it had not. The testimony of the parties made clear that all of them believed that the agreement was already approved and the parties operated under the agreement as though it had been. Accordingly, the only real issue before lower court was whether Adoptive Mother was in breach of the agreement by failing to allow visitation pursuant to the terms of the [PACAs]. Therefore, the lower accord [sic] abused its discretion by engaging any analysis to declare the [PACA] at issue this [sic] case not in the best interest of [] Child.

*Id.* at 18.

Biological Mother further posits the trial court erred in failing to enforce the PACA. *Id.* at 19. Biological Mother asserts that a strong bond existed

- 12 -

between Child and her and that the court erred in not finding that enforcing PACA would continue to foster this bond. *Id.* at 20-21. Biological Mother indicates the expert retained by the court did not find contact with Biological Mother would cause harm. *Id.* at 22. She notes that none of the behavioral issues exhibited by Child are attributable to her and proceeds to highlight numerous changes introduced to Child's life by Adoptive Mother. *Id.* While noting her own compliance with the PACA, Biological Mother contends Adoptive Mother withheld visitation because she does not get along with Biological Mother. *Id.* at 21, 23.

Moreover, Biological Mother suggests that contact with her would be beneficial in assisting Child with an understanding of his cultural background. *Id.* at 23. Biological Mother maintains:

> . . . [T]he court found that upsetting [] Child's routine was further justification in failing to enforce the [PACA]. Preventing contact based on a routine change of [] Child is an abuse of discretion. All custody visits are a change in [] Child's routine at first. The major changes of [] Child's routine are brought about by Adoptive Mother with the household, school, and preventing visits. Finally, it should be remembered that it was Adoptive Mother who stopped the visits with [] Child causing a substantial change in [] Child's routine. It should not be acceptable for Adoptive Mother to create the change in [] Child's routine then benefit from said change to prevent enforcement and compliance with the [PACA] visitation provisions. For all of the foregoing reasons, the trial court improperly denied enforcement and abuse its discretion.

*Id.* at 24.

Lastly, Biological Mother argues that the statutes with respect to the filing, approval, and enforcement of PACA are violative of due process. *Id.* at

25. Biological Mother highlights her lack of notice as to the adoption proceedings due to the termination of her parental rights. *Id.* at 28. She also states that because she had no notice, she was unaware of and unable to participate in the adoption proceeding and present the executed PACA.[10] *Id.* Biological Mother contends:

> [b]ecause of the lack of notice created by the statutes coupled with the lack of notice to the [Biological] Mother of the court handling the adoption, [Biological] Mother lost her opportunity to ensure her rights in the [PACA] were presented to the court for proper adjudication. Therefore, as a result of this lack of notice and an opportunity to enforce her rights, her constitutionally protected rights were violated.

*Id.* at 30.

In addressing the enforceability of the PACA in the instant matter, the trial court stated:

### (1) Agreement in writing

Both of the Post-Adoption Contact Agreements at issue in this case were in writing.

### (2) Existence of affidavits

Both of the PACAs were accompanied with affidavits that comply with 23 Pa.C.S.A. § 2735(b)(1).

### (3) Court approval

This "element" of enforcing a [PACA] is very much in dispute. [Biological Mother] claimed that the agreement was submitted to and approved by the Delaware County Judge who

_____

[10] Biological Mother stresses that separate courts handled the termination and adoption proceedings. Biological Mother's Brief at 29-30. Nevertheless, she indicates that she was reasonable in proceeding as if the PACA were presented for approval and approved. *Id.* at 28.

entered the Decree Approving termination of Parental Rights. In support of this claim, they present an email chain in which several attorneys discuss the fact that the agreement was presented to and approved by the Delaware County Judge when the termination of parental rights was adjudicated. [Biological Mother] disputes that the agreement was ever "approved" by any judge. This [c]ourt has no independent knowledge of what occurred in Delaware County on October 26, 2018. The record forwarded by the Delaware County Court to this [c]ourt does not contain the [PACA], nor is there any reference to that agreement in the Delaware County Court's Final Decree Terminating Parental Rights. With respect to what occurred in Lebanon, we can definitively state that this [c]ourt never undertook a broad evaluation of what was in the best interest of [Child] pursuant to 23 Pa.C.S.A. § 2735(b)(2). While we were obviously aware that some sort of [PACA] had been signed, the agreement itself was not presented to this [c]ourt or made part of the record of the adoption proceeding. In fact, the first time that this [c]ourt saw the [PACA] was when the Petition to Enforce was submitted by [Biological Mother] and [Biological Maternal Grandmother].

Is it possible that a broad evaluation of whether the agreement was in the best interest of [Child] was conducted in Delaware County? Certainly. However, we have no evidence of such an analysis having been made. Moreover, we can state with certainty that this [c]ourt never conducted such an analysis.

Section 2735(c) states that a [PACA] "shall not be legally enforceable unless approved by the Court." There is no definition in the act as to what constitutes "Court approval." If knowledge and acquiescence suffices, we can conclude without difficulty that this bar was hurdled. However, if "Court approval" requires a factual proceeding at which all of the factors set forth in § 2735(b)(2) are considered, then we highly doubt that such "approval" was afforded.

In the end, we are forced to acknowledge that confusion undoubtedly occurred because termination of parental rights occurred in Delaware County and the adoption occurred in Lebanon County. Additional confusion arose because the adoption did not occur for over one (1) year after termination of parental rights occurred. In addition, we recognize that neither [Biological Mother] nor [Biological Maternal Grandmother] were given notice of the adoption proceeding and neither had the ability to submit the [PACA] to this [c]ourt at the Adoption hearings. Finally, no

- 15 -

attorney involved in this case requested a formal analysis of all factors set forth in § 2735(b)(2). . . .

T.C.O., 7/19/21, at 14-16.

Critical to Biological Mother's efforts and ability to enforce the PACA is whether it was filed with and approved by the trial court on or before the finalization of adoption. **See** 23 Pa.C.S.A. § 2735(c) ("An agreement shall not be legally enforceable unless approved by the court."); **see also** 23 Pa.C.S.A. § 2738(c)(2) ("For an agreement to be enforceable, it must be [a]pproved by the court on or before the date for any adoption decree."); **see also** 23 Pa.C.S.A. § 2735(a) ("An agreement shall be filed with the court that finalizes the adoption of the child.").

Instantly, the adoption was finalized in Lebanon County by decree dated September 9, 2019.[11] N.T., 6/16/20, at 70; Decree, 9/10/19. Despite knowledge of and the court's retaining of jurisdiction to address the PACA involving Biological Mother, as well as that with respect to Biological Maternal Grandmother, the record is devoid of evidence that the PACA was filed and/or approved in Lebanon County on or before this date.

Also, there is no indication that the factors set forth by Section 2735(b) as conditions for approval were analyzed on or before the entrance of the adoption decree. In fact, as noted by the court, the PACA was not presented to the court until it was attached as an exhibit to the petition for enforcement. As the court stated, "[w]ith respect to what occurred in Lebanon, we can

_____

[11] As indicated **supra**, while dated September 9, 2019, the decree was filed and docketed, and notice was provided, on September 10, 2020.

definitively state that this [c]ourt never undertook a broad evaluation of what was in the best interest of [Child] pursuant to 23 Pa.C.S.A. 2735(b)(2). While we were obviously aware that some sort of [PACA] had been signed, the agreement itself was not presented to this [c]ourt or made part of the record of the adoption proceeding." T.C.O., 1/19/21, at 15. As such, we find there was no valid agreement to enforce; therefore we are constrained to quash Biological Mother's appeal for lack of jurisdiction.[12, 13]

Notwithstanding, we would further find that it is not in Child's best interests for the PACA to be enforced given the opinion of the mental health professionals, both Child's treating therapist, Shannon Harper, and the expert subsequently appointed by the court, Dr. Virginia Murphy, that visitation with biological family should not occur at the present. **See** Exhibits 14 and 15; **see also** N.T., 12/21/20, at 4-40. In addition, and significantly, the PACA

---

[12] Although the court engages in an analysis of the factors set forth by 23 Pa.C.S.A. § 2735(b) retroactively, we do not find this overcomes the fact that this was not done in connection with the agreement being filed and approved **prior** to the adoption being finalized. **See** 23 Pa.C.S.A. § 2738(f) (stating "[t]his section constitutes the exclusive remedy for enforcement of an agreement, and no statutory or common law remedy shall be available for enforcement or damages in connection with an agreement.").

[13] It is well-settled that, "[a]n appeal lies only from a final order, unless permitted by rule or statute." **Stewart v. Foxworth**, 65 A.3d 468, 471 (Pa.Super. 2013). Generally, a final order is one that disposes of all claims and all parties. **See** Pa.R.A.P. 341(b).; **see also G.B. v. M.M.B., T.B. & A.B.**, 670 A.2d 714, 715 (Pa.Super. 1996) (holding that "a custody order will be considered final and appealable only after the trial court has concluded its hearings on the merits and the resultant order resolves the pending custody claims between the parties."). Given our finding as to the lack of jurisdiction, we do not address this additional preliminary issue.

included the provision that the recommendations of Child's mental health professionals would be followed and that visitation will occur so long as it is in Child's best interests, specifically Child's mental health interests. *See* Exhibit 1, at 4(j) ("If at any time a mental health professional who is providing services to [Child] advises a change in the visitation, then the visits according to this agreement will occur in accordance with any recommendations made by that mental health professional who is treating [Child].").

Moreover, we would decline to find that Biological Mother's constitutional rights were violated due to a lack of notice of the adoption as Biological Mother retained no parental rights at that time. As the trial court explained:

> Both 23 Pa.C.S.A. § 2735 and 23 Pa.C.S.A. § 2738 deal with PACAs. Both statutes implicitly recognize that PACAs should be governed by principles that transcend standard contract law. That being said, neither [Section] 2735 nor [Section] 2738 specifically prohibit PACAs. Read together, the statutes create a road map of sorts for a pathway that leads to enforcement of the PACA. This [c]ourt fails to perceive how Sections 2735 and 2738, either individually or collectively, could run afoul of the Due Process clause found in the Constitutions of our state and country. To the extent necessary, we would have rejected a constitutionality argument at trial had one been presented to us.

T.C.O., 3/3/21, at 2-3. With this, we agree.

Accordingly, for the foregoing reasons, we quash Biological Mother's appeal.

Appeal quashed.

Judge Kunselman joins the memorandum.

Judge McCaffery concurs in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 09/21/2021