**[J-9-2022]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

**BAER, C.J., TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, BROBSON, JJ.**

| | | |
|---|---|---|
| IN RE: PRIVATE COMPLAINT FILED BY LUAY AJAJ | : | No. 55 MAP 2021 |
| | : | |
| | : | Appeal from the Order of the |
| | : | Superior Court at No. 3421 EDA |
| APPEAL OF: COMMONWEALTH OF PENNSYLVANIA | : | 2019 dated February 25, 2021, |
| | : | Reconsideration Denied May 3, |
| | : | 2021, Affirming the Order of the |
| | : | Montgomery County Court of |
| | : | Common Pleas, Criminal Division, at |
| | : | No. CP-46-MD-0001539-2019 dated |
| | : | October 31, 2019 and Remanding. |
| | : | |
| | : | ARGUED: March 9, 2022 |

## OPINION

**JUSTICE BROBSON**                                    **DECIDED: January 19, 2023**

Pennsylvania Rule of Criminal Procedure 506 (Rule 506)[1] authorizes private

citizens to file criminal complaints against other persons before the appropriate issuing

---

[1] Rule 506 provides:

> (A) When the affiant is not a law enforcement officer, the complaint shall be submitted to an attorney for the Commonwealth, who shall approve or disapprove it without unreasonable delay.

> (B) If the attorney for the Commonwealth:

> (1) approves the complaint, the attorney shall indicate this decision on the complaint form and transmit it to the issuing authority;

> (2) disapproves the complaint, the attorney shall state the reasons on the complaint form and return it to the affiant. Thereafter, the affiant may petition the court of common pleas for review of the decision.

authority.[2]  Before doing so, however, the private criminal complaint must first be submitted to an attorney for the Commonwealth[3] for approval or disapproval.  If the attorney for the Commonwealth disapproves the filing of the private criminal complaint with the issuing authority, Rule 506 thereafter permits the private complainant to petition the court of common pleas to review the disapproval decision.

In this discretionary appeal, we consider whether the Superior Court erred when it affirmed a decision by the Court of Common Pleas of Montgomery County, Criminal Division (trial court), which overturned the decision of the Montgomery County District Attorney (DA).  The DA had disapproved the private criminal complaint (Complaint) of Luay Ajaj (Father) against Saja Ibrahim Abdulkareem Al Rabeeah (Mother) for violations of 18 Pa. C.S. § 2904(a) (interference with custody of children),[4] and 18 Pa. C.S. § 2909(a) (concealment of whereabouts of a child).[5]  In so doing, we first consider the

---

[2] An issuing authority "is any public official having the power and authority of a magistrate, a Philadelphia arraignment court magistrate, or a magisterial district judge." Pa.R.Crim.P. 103.

[3] In this context, the attorney for the Commonwealth can be either the county district attorney (or his or her designee) or the Attorney General (or his or her designee), depending on the nature of the criminal charges.  *See* Sections 205 and 206(a) of the Commonwealth Attorneys Act, Act of October 15, 1980, P.L. 950, 71 P.S. §§ 732-205, -206(a).

[4] Section 2904(a) of the Crimes Code provides:  "A person commits an offense if [s]he knowingly or recklessly takes or entices any child under the age of 18 years from the custody of its parent, guardian or other lawful custodian, when [s]he has no privilege to do so."

[5] Section 2909(a) of the Crimes Code provides:

A person who removes a child from the child's known place of residence with the intent to conceal the child's whereabouts from the child's parent or guardian, unless concealment is authorized by court order or is a reasonable response to domestic violence or child abuse, commits a felony of the third degree.  For purposes of this subsection, the term "removes" includes personally removing the child from the child's known place of residence, causing the child to be removed from the child's known place of

(continued…)

proper standard of review courts should apply when reviewing a disapproval decision under Rule 506(B)(2). In that regard, we hold that a reviewing court may only overturn a disapproval decision under Rule 506(B)(2) if the private complainant demonstrates that the disapproval decision amounted to bad faith, occurred due to fraud, or was unconstitutional. Applying that standard of review here, we conclude that Father failed to demonstrate that the DA's decision to disapprove the Complaint amounted to bad faith, occurred due to fraud, or was unconstitutional, and, consequently, we reverse the Superior Court's order.

## I. RELEVANT PRECEDENT

We begin with a review of the relevant precedent applicable to private criminal complaints. As noted above, Rule 506 governs the initiation of criminal proceedings and authorizes private citizens to file private criminal complaints against another person with an issuing authority upon the approval of an attorney for the Commonwealth. Pa.R.Crim.P. 506(A). A private criminal complaint must, at the outset, set forth a *prima facie* case of criminal conduct. *In re Wilson*, 879 A.2d 199, 211 (Pa. Super. 2005) (en banc). The attorney for the Commonwealth is thereafter required to investigate the allegations set forth in the private criminal complaint and, based on that investigation, render his or her approval or disapproval of the private criminal complaint. *Id.* In so doing, the attorney for the Commonwealth "has a general and widely recognized power to conduct criminal litigation and prosecutions on behalf of the Commonwealth, . . . to decide whether and when to prosecute, and [to decide] whether and when to continue or discontinue a case." *Commonwealth v. Brown*, 708 A.2d 81, 84 (Pa. 1998) (*Brown II*)

---

residence, preventing the child from returning or being returned to the child's known place of residence and, when the child's parent or guardian has a reasonable expectation that the person will return the child, failing to return the child to the child's known place of residence.

(plurality opinion) (some alterations in original) (citations omitted) (quoting *Commonwealth v. DiPasquale*, 246 A.2d 430, 432 (Pa. 1968)). "Thus, the [attorney for the Commonwealth] is permitted to exercise sound discretion to refrain from proceeding in a criminal case whenever he [or she], in good faith, thinks that the prosecution would not serve the best interests of the state." *Id.* (quoting *Commonwealth v. Malloy*, 450 A.2d 689, 692 (Pa. Super. 1982)).

In the event that the attorney for the Commonwealth disapproves a private criminal complaint, the complainant may petition the court of common pleas for review of the decision. Pa.R.Crim.P. 506(B)(2). Rule 506(B)(2) is silent, however, on what standard of review the court of common pleas is required to apply when reviewing that decision. In *Commonwealth v. Benz*, 565 A.2d 764 (Pa. 1989) (plurality opinion), a plurality of this Court "distinguished between a prosecutor's disapproval of a private complaint for reasons of policy and a disapproval based on a legal evaluation of the sufficiency of the complaint" and "essentially endorsed a *de novo* review by the [court of common pleas] when a prosecutor's disapproval is based on a legal determination of the sufficiency of the complaint." *Brown II*, 708 A.2d at 84. "The *Benz* plurality recognized, however, that when a prosecutor's disapproval is based on policy concerns, a *de novo* review would be improper: '[i]f the district attorney had stated policy reasons to support the decision not to prosecute, this Court would [give] deference . . . to such a discretionary use of the executive powers conferred in that officer.'" *Id.* (some alterations in original) (quoting *Benz*, 565 A.2d at 767 n.4).

Thereafter, in *Brown II*, a majority of this Court agreed that "a [court of common pleas] should not interfere with a prosecutor's policy-based decision to disapprove a

private complaint absent a showing of bad faith, fraud, or unconstitutionality."[6] *Id.* In so doing, this Court noted that "[a]pplication of this standard recognizes that proper deference must be given to the discretionary decisions of a prosecutor—a member of the executive branch—while acknowledging the authority and responsibility of the judiciary to ensure justice in the criminal court system." *Id.* at 84-85. A plurality of this Court, in an opinion authored by Justice Nigro, then went on to define "bad baith" as "not simply bad judgment or negligence, but rather . . . the conscious doing of a wrong because of . . . moral obliquity"—*i.e.*, "a 'deviation from moral rectitude or sound thinking.'" *Id.* at 85 (some alterations in original) (quoting Black's Law Dictionary 139 (6th ed. 1990) and Merriam-Webster's Collegiate Dictionary 802 (10th ed. 1996)). Justice Cappy, on the other hand, indicated in his opinion in support of reversal that "bad faith is shown where the action under review was undertaken with a [fraudulent,] dishonest[,] or corrupt purpose." *Id.* at 87 (Cappy, J., opinion in support of reversal).

Following this Court's decision in *Brown II*, the Superior Court "continued to wrestle with a working definition of the appellate role . . . in a valiant effort to harmonize what appears to be a divergence in the law with respect to appellate review" of a decision to disapprove a private criminal complaint. *In re Wilson*, 879 A.2d at 213. As a result, in *In re Wilson*, the Superior Court summarized the standard that both the Superior Court and the courts of common pleas continue to apply when reviewing a prosecutor's disapproval decision:

---

[6] Although *Brown II* was a plurality opinion, Justice Cappy, joined by Justices Castille and Newman, noted in his opinion in support of reversal that "[t]he opinion in support of affirmance sets forth the correct standard of review as one requiring a showing of fraud, bad faith or unconstitutionality." *Brown II*, 708 A.2d at 86 (Cappy, J., opinion in support of reversal). Thus, a majority of this Court agreed on the proper standard to be applied by a court of common pleas when reviewing a district attorney's policy-based decision to disapprove a private criminal complaint. Where this Court disagreed in *Brown II* was on "the definition of the terms employed within [that] standard of review and the application of [the] standard." *Id.*

Consistent with established Pennsylvania law in general, we now hold that when the district attorney disapproves a private criminal complaint solely on the basis of legal conclusions, the [court of common pleas] undertakes *de novo* review of the matter. Thereafter, the appellate court will review the [court of common pleas'] decision for an error of law. As with all questions of law, the appellate standard of review is *de novo* and the appellate scope of review is plenary.

We further hold that when the district attorney disapproves a private criminal complaint on wholly policy considerations, or on a hybrid of legal and policy considerations, the [court of common pleas'] standard of review of the district attorney's decision is abuse of discretion. This deferential standard recognizes the limitations on judicial power to interfere with the district attorney's discretion in these kinds of decisions.

The private criminal complainant has the burden to prove the district attorney abused his[/her] discretion, and that burden is a heavy one. In the Rule 506 petition for review, the private criminal complainant must demonstrate the district attorney's decision amounted to bad faith, fraud or unconstitutionality. The complainant must do more than merely assert the district attorney's decision is flawed in these regards. The complainant must show the facts of the case lead only to the conclusion that the district attorney's decision was patently discriminatory, arbitrary or pretextual, and therefore not in the public interest. In the absence of such evidence, the [court of common pleas] cannot presume to supervise the district attorney's exercise of prosecutorial discretion[] and should leave the district attorney's decision undisturbed.

Thereafter, the appellate court will review the [court of common pleas'] decision for an abuse of discretion, in keeping with settled principles of appellate review of discretionary matters.

*Id.* at 214-15 (emphasis omitted) (footnotes omitted) (citations omitted). Subsequent thereto, in *Commonwealth v. Michaliga*, 947 A.2d 786 (Pa. Super. 2008), the Superior Court considered the differing definitions of bad faith offered by this Court in *Brown II* and adopted the definition advanced by Justice Cappy in his opinion in support of reversal— *i.e.,* that bad faith is demonstrated when the district attorney acted with a fraudulent, dishonest, or corrupt purpose. *Michaliga*, 947 A.2d at 794-95. In so doing, the Superior Court explained:

[W]e find the definition put forth by Justice Cappy in *Brown [II]* to be more persuasive then [sic] the definition used by Justice Nigro. Justice Cappy's definition of bad faith objectively focuses upon the intent of the prosecutor. Conversely, Justice Nigro's definition, based in part upon "moral rectitude," is unworkable because it introduces a [court of common pleas'] own personal beliefs into its determination and, therefore, renders appellate review impossible. In essence, using Justice Nigro's definition of bad faith permits the [court of common pleas] to substitute its judgment for that of the district attorney's office. This it cannot do.

*Id.* (citation omitted).

## II. BACKGROUND

Having set forth the relevant legal precedent under which the present controversy arose, we now turn to the underlying facts and procedural history of this case, which are somewhat complicated and involve a father's attempts to secure the return of his two children from Iraq, where Mother has allegedly been holding them since August 2017 in contravention of court orders.

On May 29, 2019, in an effort to facilitate the cooperation of foreign law enforcement authorities in his plight to reunite with his children in the United States, Father filed the Complaint against Mother, accusing her of interfering with the custody of their children in violation of 18 Pa. C.S. § 2904(a) and concealing the whereabouts of their children in violation of 18 Pa. C.S. § 2909(a). (Reproduced Record (R.R.) at 4a-77a.) In support thereof, Father alleged that the children resided in West Norriton Township, Montgomery County, Pennsylvania, from "the time of their birth until [August 2017, when] Mother orchestrated an overseas child abduction/parental kidnapping of the . . . children . . . with the support of Mother's powerful uncles in Iraq." (*Id.* at 7a, 9a.) Apparently, Father, Mother, and the children traveled from the United States to Iraq under the belief that Mother's father, who lives in Iraq, was very ill. (*Id.* at 178a.) Father further alleged that, from October 2018 through May 2019, the Family Division of the Montgomery County Court of Common Pleas (family court) entered various orders that granted Father

sole legal and physical custody of the children, directed that Mother appear with the children at certain custody proceedings, directed that bench warrants be issued for Mother's arrest for her failure to appear at the custody proceedings, and held Mother in civil contempt. (*Id.* at 7a-8a, 19a, 21a, 23a-24a, 26a-27a, 29a-30a.) Father contended that Mother failed to comply with the family court's orders and, instead, "retain[ed] the children [through an] overseas international abduction into a war zone (Iraq)." (*Id.* at 8a.) He also contended that Mother's powerful uncles and various other third parties have made threats on his life in connection with his continued attempts to seek the whereabouts of his children and have his children returned to the United States. (*Id.* at 8a-9a.)

Father further alleged that he reported Mother's abduction/kidnapping of the children to and/or sought assistance from various law enforcement agencies, including the Office of American Citizen Services at the United States Embassy located in Baghdad, Iraq, a United States Department of State's (DOS) passport center, DOS's Bureau of Diplomatic Security Service, DOS's Office of Children's Issues, the Federal Bureau of Investigation (FBI), the United States Attorney's Office for the Eastern District of Pennsylvania, the DA's Office, the West Norriton Township Police Department, the National Center for Missing and Exploited Children, and the National Crime Information Center. (*Id.* at 9a-10a.) Father detailed the high-level security risk to United States' citizens in Iraq due to terrorism, crime, and political violence. (*Id.* at 11a, 67a-74a, 76a-77a.) Father contended that the filing of criminal charges against Mother and the subsequent issuance of a warrant for Mother's arrest would assist him in his efforts to locate the children and have them returned to the United States, because such action would, *inter alia*, "facilitate cooperation from foreign law enforcement authorities by authorizing the issuance of an INTERPOL 'Red Notice'" and "serve as justification for the

appropriate [authorities] to revoke [Mother's] passport[,] thus limiting subsequent international travel and potentially creating obstacles [to Mother's] ability to remain (legally or otherwise) in a foreign country." (*Id.* at 10a.)

On June 19, 2019, the DA—through Assistant District Attorney Brianna L. Ringwood (ADA Ringwood) of the DA's Office—disapproved the Complaint, identifying "evidentiary issues" as the sole reason for her decision in the limited space provided on the complaint form. (*Id.* at 79a.) On June 26, 2019, Father petitioned the trial court, seeking *de novo* review of the disapproval decision. (*Id.* at 83a-85a.) Father alleged that *de novo* review was appropriate because the DA's disapproval decision was based solely on legal conclusions. (*Id.* at 84a.) The DA filed a response to Father's petition, wherein he indicated that he had disapproved the Complaint for the following reasons: (1) "[a]s a policy, the [DA] does not approve private [criminal] complaints alleging a felony;" (2) "as a matter of policy, caution should be taken in criminalizing the actions of estranged parents involved in a custody dispute;" (3) "[Father] has alternative remedies available [to him] in both civil court and [through] federal authorities[,] who are much better equipped with resources and experience in dealing with foreign authorities such as those of Iraq;" (4) "[a]s it stand[s] now, there is insufficient probable cause that [Mother] committed a crime as the allegations in the [C]omplaint focus on the conduct of her [u]ncles who reside in Iraq;" and (5) "Montgomery County [l]aw [e]nforcement does not have the resources to conduct an investigation to evaluate the merit of [the C]omplaint to be able to exercise discretion [as to] whether it is appropriate for prosecution, as is [their] ethical duty." (*Id.* at 169a-70a.)

The trial court held oral argument[7] on Father's petition for review on July 23, 2019, the same day that the DA filed his response to the petition. (*Id.* at 173a-200a.) At the hearing, ADA Ringwood explained to the trial court the DA's reasons for disapproving the Complaint. (*Id.* at 181a-86a, 194a-97a.) She stated that, as a matter of policy, the DA does not approve any private criminal complaint that requests felony charges, and the crimes that Father has accused Mother of committing—*i.e.*, interference with custody of children and concealment of whereabouts of a child—are both felonies under Pennsylvania law. (*Id.* at 181a-82a.) ADA Ringwood further explained that the DA, again as a matter of policy, is "very cautious in criminalizing disputes over custody," because he believes that these matters are best handled through civil custody proceedings. (*Id.* at 182a-83a.) She also explained that Father has alternative resources available to him to further his efforts to reunite with his children in the United States, including contacting federal enforcement authorities who are "in a better position . . . to be able to investigate this type of crime and decide whether [it is] appropriate to move forward with the criminal prosecution" due to the involvement of a foreign jurisdiction. (*Id.*at 183a-84a, 197a.)

ADA Ringwood noted that the DA also does not believe that there is a reasonable likelihood that Mother would be convicted of interference with custody of children and concealment of whereabouts of a child due to certain evidentiary concerns. (*Id.* at 184a-87a.) In support thereof, ADA Ringwood indicated that the DA does not have the resources to corroborate and/or properly investigate Father's accusations against Mother, because, with the exception of Father, all of the witnesses are located in Iraq. (*Id.* at 184a.) In her view, it would be inappropriate to bring criminal charges against

---

[7] The matter was initially scheduled for an evidentiary hearing. According to the trial court, however, "[ADA] Ringwood preempted [Father's planned testimony] with the argument that a complainant is not entitled to an evidentiary hearing on a petition to review disapproval of a private criminal complaint," and "[t]he hearing [thereafter] became counsels' oral argument based on their versions of the facts." (Trial Ct. Op. at 16.)

Mother when the DA cannot adequately determine whether Mother has, in fact, committed a crime. (*Id.* at 184a, 194a-95a.) She also indicated that the alleged criminal conduct focuses primarily on the actions of Mother's uncles, and the DA has "no way of investigating whether [Mother] went [to Iraq] of her own free will, knowing that she was going to be kept in Iraq, . . . or whether . . . she went there and her uncles made the decision for her that she and her children were going to stay." (*Id.* at 184a-85a.) ADA Ringwood also explained that one of the elements of the crime of interference with the custody of children is lack of legal privilege to take the children. (*Id.* at 185a.) The family court order granting Father sole legal and physical custody of the children, however, was not issued until October 2018, after the children were already in Iraq with Mother. (*Id.* at 185a-86a.) She further explained that the DA has no way of investigating whether Mother "believe[d] that her action was necessary to preserve the children from danger" and/or whether Mother is acting in accordance with an order of a court of competent jurisdiction in Iraq, both of which, if proven, are potential defenses to the crime of interference with the custody of children. (*Id.* at 186a, 195a-96a.) Lastly, ADA Ringwood indicated that the DA is charged with the responsibility of determining whether he can prove beyond a reasonable doubt that a crime has been committed. (*Id.* at 195a.) ADA Ringwood does not believe the DA can meet this burden in this particular instance. (*Id.*) Finally, she maintained that it would be inappropriate for the DA to file charges simply in an attempt to further Father's desire to reunite with his children, which was Father's sole motivation for pursuing a private criminal complaint against Mother. (*Id.*)

By order dated October 30, 2019, the trial court granted Father's petition, overturned the DA's disapproval decision, and directed the DA to approve and transmit the Complaint to the issuing authority for prosecution. (*Id.* at 210a.) The DA appealed to the Superior Court, and the trial court ordered the DA to file a statement of errors

complained of on appeal pursuant to Pennsylvania Rule of Civil Procedure 1925 (Rule 1925). (Trial Ct. Op. at 19.) In its subsequent Rule 1925 opinion, the trial court initially explained that the "first bridge to cross" on appeal is to decide whether the DA waived his policy-based reasons for disapproving the Complaint for failing to identify those bases for disapproval on the complaint form itself, as the DA did with respect to "evidentiary issues." (*Id.* at 20.) While the trial court suggested that the DA's last-minute change in position put Father at a disadvantage and "cast[] doubt on [the] genuineness" of its policy-based justifications, the trial court ultimately deferred consideration of the waiver issue for the Superior Court's consideration. (*Id.* at 20-21.) The trial court then proceeded to review the DA's disapproval decision under both a *de novo* standard of review and for an abuse of discretion. (*See id.* at 21-30.)

Applying a *de novo* standard of review, the trial court rejected the DA's "evidentiary concerns" about proving the charges against Mother, noting that Father is the best source of evidence as to what happened with the children in Iraq and that Father, therefore, presented a *prima facie* case that Mother concealed the whereabouts of the children in violation of 18 Pa. C.S. § 2909(a).[8] (*Id.* at 21-23.) The trial court explained that Mother, "with obvious intent, failed to disclose the children's whereabouts to [Father]" until at least January 2019, when she provided the family court with an address in Baghdad. (*Id.* at 22.) She thereafter "embarked on a steady course of assuring the [family c]ourt [that] she would return with the children to [Montgomery] County to contest in the various proceedings scheduled to consider the children's custody[] and [that she] . . . intended to return with [the children] to live here permanently[] but misled the [family c]ourt[] and never

---

[8] The Superior Court noted that the trial court's analysis and conclusion that the Complaint made out a *prima facie* case against Mother for concealment of whereabouts of a child applied with equal force to the charge of interference with custody of children. *In re Ajaj*, 253 A.3d 722, 728 (Pa. Super. 2021).

did appear, with or without [the children]." (*Id.* at 22-23.) The trial court also rejected the DA's concerns about overcoming potential affirmative defenses. (*Id.* at 23-25.) The trial court explained that, if Mother concealed the children's whereabouts in an attempt to protect them from danger or Mother was fleeing domestic violence or child abuse, Mother had every opportunity to present those circumstances to the family court during the custody proceedings, which she failed to do. (*Id.* at 23-25.) The trial court further explained that giving any preclusive effect to custody proceedings and/or custody orders in Iraq "is at best speculative[] [and] at worst in direct contravention" to the family court's exercise and retention of jurisdiction over and adjudication of the children's custody. (*Id.* at 25.) The trial court also dismissed the DA's concerns that he lacked the resources necessary to investigate properly the allegations in the Complaint, noting that federal enforcement authorities

> were "blinking red" with signals to the [DA] to file charges and have a warrant issued so that the federal government would have the requisite basis upon which to pursue the matter and assist the [DA] with the only means possible of securing capture of [Mother] and, hopefully by extension, rescue of the children.

(*Id.* at 26.) The trial court also noted that individuals from both the FBI and DOS had advised Father that "he would have little chance of getting their best efforts to secure the capture of . . . [M]other and the return of the children if the [Commonwealth] did not file charges and issue a warrant." (*Id.*)

Applying an abuse of discretion standard of review to the asserted policy-based grounds for disapproving the Complaint, the trial court concluded that the DA did, in fact, abuse his discretion. The trial court explained that the DA did not present any evidence to establish that it provided guidance to his prosecutors on his policy to disapprove all private criminal complaints alleging a felony and that any such policy was "an especially bad one" that "could allow some very bad crimes to go unprosecuted." (*Id.* at 27-28.)

Although the trial court recognized that a policy encouraging caution when criminalizing the actions of parents in a custody dispute "may promote a laudable principle where one parent . . . tries to tilt the playing field . . . by injecting criminal charges into what ordinarily should be handled as a civil matter," it noted the absence of such a circumstance here, as the family court made "painstaking efforts" to apply civil remedies without success. (*Id.* at 28.) The trial court further explained that any policy that leaves "victims of crime to their civil remedies and eschew[s] involvement in child-custody matters" should not be applied to these extraordinary circumstances, where civil remedies have proven wholly inadequate. (*Id.* at 29.)

A three-judge panel of the Superior Court affirmed the trial court's order in a unanimous, published decision. *In re Ajaj*, 253 A.3d at 730. After setting forth the competing standards of review, the Superior Court found no error in the trial court's conclusion that the DA's evidentiary concerns lacked merit. *Id.* at 726-28. With respect to the waiver question, the Superior Court also explained that, "[w]hile [it] might be inclined to find the [DA] limited [his] basis for disapproval [of the Complaint] when [he] noted only evidentiary issues in [his] disapproval, [its] review of the trial court's disposition under an abuse of discretion standard would not yield a different result." *Id.* at 728. In support thereof, the Superior Court summarized the trial court's consideration of the DA's decision to disapprove the Complaint on the basis of policy-based considerations and concluded that the trial court did not abuse its discretion by finding that the DA failed to advance sufficient policy-based considerations in support of his disapproval of the Complaint, because those policy-based considerations "deviate from moral rectitude and sound thinking under the facts as developed in the custody proceedings and as summarized in [Father's Complaint] and [the] exhibits" attached thereto. *Id.* at 730.

The DA filed a petition for allowance of appeal with this Court, which we granted to address the following issue, as phrased by the DA:

> Did the Superior Court err as a matter of law when, in a published opinion, it affirmed the lower court order overturning the [DA's] disapproval of a private criminal complaint filed by [Father] against [Mother], despite the numerous evidentiary and policy concerns cited by the [DA], including the lack of a *prima facie* case, an inability to thoroughly investigate the matter because all possible witnesses and evidence (with the exception of [Father]) are in Iraq, the [DA's] policy of not accepting criminal complaints alleging felonies, and [his] general policy of exercising caution when it comes to criminalizing actions taken during custody disputes which are better handled through civil proceedings, and despite [Father's] failure to overcome the presumption of good faith and soundness attached to the [DA's] decision to not prosecute?

*In re Ajaj*, 259 A.3d 880 (Pa. 2021). As this issue implicates a question of law, our standard of review is *de novo* and our scope of review is plenary. *In re Vencil*, 152 A.3d 235, 241 (Pa. 2017).

### III. PARTIES' ARGUMENTS

The DA[9] argues that the trial court erred and abused its discretion by overturning the Commonwealth's decision to disapprove the Complaint, because, despite the existence of sound legal and policy-based considerations supporting the DA's decision, the trial court failed to defer to the prosecutor's decision and, instead, "motivated by sympathy for [Father] and equipped with outside-of-the-record information from a separate family court custody matter, . . . improperly substituted its judgment for that of the [DA]." (Commonwealth's Br. at 25-26.) The DA similarly contends that the Superior

---

[9] The Office of Attorney General (OAG) and the Pennsylvania District Attorneys Association (PDAA) jointly filed an *amicus* brief in support of the DA. The gravamen of OAG's and PDAA's position is that the trial court violated the separation of powers doctrine when it substituted its judgment for that of the prosecutor and overturned the DA's decision disapproving the Complaint—*i.e.*, the trial court improperly encroached on the Commonwealth's prosecutorial discretion. In support thereof, OAG and PDAA advance arguments similar to those raised by the DA, which are set forth in detail below.

Court erred by affirming the trial court's order, because the Superior Court relied on the trial court's erroneous findings, which were based on facts outside the record, and "undertook an analysis of the prosecutor's actions when its review should have been limited to the propriety of the trial court's actions." (*Id.* at 26 (emphasis omitted).)

More specifically, the DA argues that the trial court applied the wrong standard of review. It contends that "[t]he standard of review of the disapproval of a private criminal complaint is well[ ]settled" and, whenever a prosecutor disapproves a private criminal complaint based upon a hybrid of legal and policy-based considerations, like here, the court of common pleas must apply an abuse of discretion standard of review, not a *de novo* standard of review. (*Id.* at 28-29.) The DA suggests that the trial court failed to comply fully with this standard, because it only applied an abuse of discretion standard of review to its consideration of the DA's policy-based reasons for the disapproval of the Complaint and did not apply that same standard to its consideration of the DA's legal or evidentiary-based reasons.

The DA also argues that the trial court failed to afford his disapproval decision the presumption of good faith and soundness that it was due and "seemingly relieved [Father] of his burden" to prove that the prosecutor's decision amounted to bad faith, occurred due to fraud, or was unconstitutional. (*Id.* at 32.) Indeed, the DA argues that Father did not prove, let alone even assert, that the DA's disapproval decision amounted to bad faith, occurred due to fraud, or was unconstitutional. Rather, Father merely claimed, incorrectly, that his Complaint established a *prima facie* case and, therefore, the DA should have approved his Complaint for prosecution.

The DA points out that, "despite [Father's] pleading and proof deficiencies," the trial court still concluded that the DA abused his discretion. (*Id.* at 35.) He suggests, however, that, contrary to the trial court's implication, there was nothing nefarious about

ADA Ringwood's conduct; rather, ADA Ringwood complied with Rule 506 by providing an appropriate reason for the DA's disapproval of the Complaint "in the designated space on the private criminal complaint form."  (*Id.* at 36.)  Then, after Father petitioned the trial court for review of the disapproval decision, ADA Ringwood "simply elaborated on the reasons she originally cited."  (*Id.*)  In other words, the DA contends that "evidentiary or legal reasons and policy reasons are [not] mutually exclusive" and an evidentiary/legal issue, including that a case lacks prosecutorial merit, can also be considered a policy issue.  (*Id.* at 37.)

The DA further maintains that his disapproval of the Complaint was not fraudulent or made in bad faith, but rather was "made in good faith and in the public interest, consistent with the [DA's] ethical obligation to only prosecute cases that he . . . knows are supported by probable cause."  (*Id.* at 38.)  In support, the DA contends that he properly exercised his discretion in disapproving the Complaint because:  (1) the DA's Office lacks the necessary resources to investigate properly and evaluate the merits of Father's allegations given that the relevant conduct occurred in Iraq; (2) there was insufficient probable cause that Mother committed a crime given that the allegations set forth in the Complaint focus, not on Mother's conduct, but on the conduct of Mother's "powerful uncles" living in Iraq; and (3) the DA was not confident that he could prove that Mother's alleged actions were not a reasonable response to domestic violence given representations that Mother made before the family court.  According to the DA, the trial court and the Superior Court "completely disregard[ed] these ethical constraints" and "not only strip[ped] away the discretion afforded prosecutors in determining whether to prosecute an alleged offender, but also potentially enmesh[ed] a prosecutor in the ethical conundrum of pursuing charges that he or she does not believe are appropriate."  (*Id.* at 43.)

The DA further contends that, even if this Court were to conclude that the trial court properly reviewed and ruled upon the above-mentioned evidentiary or legal-based reasons for its disapproval of the Complaint, the trial court still abused its discretion by overturning the DA's decision and thereby substituting its judgment for that of the prosecutor when it deemed the DA's policy to not accept private criminal complaints alleging felonies "an especially bad one." (*Id.* at 44 (quoting Trial Ct. Op. at 27).) He contends that the trial court "misse[d] the mark on the rationale behind this policy." (*Id.* at 45.) The reason that the DA does not accept private criminal complaints alleging felonies is not, as the trial court implied, because he does not want to prosecute serious charges brought by a civilian; rather, it is because private criminal complaints are not the proper mechanism to bring felony charges. The DA argues further that the trial court again improperly substituted its judgment for that of the prosecutor when it rejected the DA's policy-based considerations relative to his hesitation to criminalize actions of parents in custody disputes and the availability of other avenues of relief, particularly with federal authorities.

The DA maintains that "the Superior Court, despite being tasked with ascertaining the propriety of the trial court's action, . . . [improperly] undertook an analysis of the [DA's] conduct[]and concluded that [he] acted in 'bad faith.'" (*Id.* at 48 (emphasis omitted).) The DA argues that the Superior Court compounded this error by applying the definition of bad faith endorsed by a plurality of this Court in *Brown II*. In that regard, the DA contends that the Superior Court's decision in *Michaliga*, which adopted the definition of bad faith endorsed by Justice Cappy in his opinion in support of reversal in *Brown II*, is binding upon the Superior Court.

The DA suggests that the trial court's abuse of discretion is further reinforced by its reliance on "a plethora of documents supposedly" filed with the family court during the

custody proceedings between Father and Mother, documents which were not made part of the record in this matter. (*Id.* at 53-54.) The DA explains that he was not a party to the custody proceedings and, therefore, did not have access to those outside-of-the-record documents at the time that he made his decision to disapprove the Complaint. Additionally, the DA points out that the trial court heavily relied upon those documents to conclude that Father set forth a *prima facie* case that Mother concealed the whereabouts of the children, even though "the majority of [those documents] seem to be from a time period" after the DA made his decision to disapprove the Complaint. (*Id.* at 55-56.) The DA maintains that the Superior Court compounded this error by relying upon the trial court's recitation of these non-record facts to affirm the trial court's order. Taking particular aim at the Superior Court's conclusion that his disapproval decision, as it related to its policy-based considerations, "deviate[d] from moral rectitude and sound thinking," the DA suggests that the conclusion was largely based on the facts developed before the family court in the custody proceedings. (*Id.* at 56-57 (alteration in original) (quoting *In re Ajaj*, 253 A.3d at 730).)

The DA also suggests that the trial court inappropriately based its ruling, at least in part, on its support of and sympathy for Father. The DA maintains that, "[a]lthough [Father's] predicament may warrant sympathy[,] . . . sympathy is not a proper basis on which to decide to prosecute someone, especially where, as here, the [DA's] Office lacks the ability to thoroughly investigate the allegations that revolve around conduct that occurred in Iraq." (*Id.* at 59.) Nor is it a proper basis "for a court to force [a] district attorney to prosecute." (*Id.*)

Alternatively, the DA posits that, even if the trial court properly considered the DA's evidentiary-based reasons for his disapproval of the Complaint under a *de novo* standard of review, Father would still not have been entitled to his requested relief because the

Complaint does not make out a *prima facie* case against Mother for either concealment of whereabouts of a child or interference with custody of children. In that regard, the DA maintains that the Complaint does not definitively establish that Mother, rather than her "powerful uncles," committed these crimes. According to the DA, the facts, as alleged by Father in the Complaint, establish that the uncles informed Father that the children would not be returning to the United States, the uncles took the children's passports, the uncles informed Father that he was not permitted to see Mother, and the uncles and others (not Mother) threatened Father's life. The DA further maintains that "[t]here was simply nothing in the [C]omplaint to [demonstrate] that [M]other was even complicit in the uncles' acts, much less that she intentionally withheld the children from [Father]." (*Id.* at 62-63 (emphasis omitted).) The DA also argues that the record reflects that there were ongoing custody proceedings in Iraq, and, therefore, it is possible that, even if Mother is holding the children in Iraq, she may be acting pursuant to a valid order issued by an Iraqi court and could have legal justification to keep the children. He further argues that there is nothing in the Complaint that demonstrates that Mother was not fleeing from domestic violence or abuse. In other words, the DA suggests that the Complaint is devoid of any allegations that Mother acted with the requisite intent to commit the alleged crimes.

Father counters that, after granting him sole legal and physical custody of the children, the family court "took [a] remarkable step" and entered an order requiring "all Montgomery County [l]aw [e]nforcement [a]gencies . . . to cooperate in the capture of [Mother] and return of the . . . children." (Father's Br. at 11 (emphasis omitted) (quoting R.R. at 162a).) Father maintains that, despite the existence of this valid and enforceable order, the DA has refused to conduct a proper investigation of the allegations set forth in the Complaint, as is required. Father suggests that the DA's stated position that the DA's Office has no way to investigate the allegations properly is a farce, because, in his

opinion, an investigation is possible—*i.e.*, the DA's Office could have contacted Mother's custody attorney to determine Mother's motives, interviewed Father, questioned whether a custody order had been issued by an Iraqi court, and/or reviewed the documents filed with the family court in the parties' custody matter. The DA's Office, however, has failed to conduct any such inquiries.

Father further argues that "[i]t was not the [trial] court's heart that compelled [its] decision, it was the law[,] [as] [s]uppressing emotion is a judge's professional imperative." (*Id.* at 22.) In that regard, Father maintains that the trial court's decision is amply supported by the record and applicable law, and, therefore, the trial court did not abuse its discretion by overturning the DA's disapproval decision. In other words, relying heavily on the language of the trial court's Rule 1925 opinion, Father contends that the trial court justifiably cast doubt on the DA's belatedly raised policy concerns, properly applied a *de novo* standard of review to its consideration of the DA's disapproval decision, and properly concluded that the Complaint set forth a *prima facie* case against Mother. Father contends that, contrary to the DA's assertions, Mother's motive is an irrelevant consideration. He suggests that the DA refuses to recognize that the record establishes that Mother completed these crimes when she received notice of the family court's order granting Father sole legal and physical custody of the children and thereafter failed to return the children to the United States. Instead, the DA has "conjured alternative explanation[s]" for Mother's actions that simply do not exist and have been addressed by the family court during the custody proceedings—*i.e.*, financial difficulties in complying with the family court's orders, a custody order from an Iraqi court, and/or the involvement of domestic violence or abuse. (*Id.* at 29-32.)

Father also argues that the trial court properly rejected as unpersuasive the DA's policy-based reasons for disapproving the Complaint. He notes that, if the DA did in fact

have a policy to disapprove private criminal complaints alleging felonies, "it would have been simple enough to state at the outset this reason for disapproving the [C]omplaint[] or . . . to advance evidence that confirms the establishment of the policy" at some point prior to the time that the DA filed his brief with this Court. (*Id.* at 25-26.)  Directing our attention to his communications with the FBI, Father further posits that this Court "can see how well [the] other remedies" that the DA suggests are available to him "are working out for [him] and the children" and, therefore, maintains that this policy-based concern should not apply.  (*Id.* at 26-27.)

Father further contends that the Superior Court did not abuse its discretion by concluding that the DA's policy-based reasons deviated from moral rectitude and sound thinking or thereafter affirming the trial court's order.  In support thereof, Father first argues that, had the DA desired to rely on policy-based considerations in support of his decision disapproving the Complaint, ADA Ringwood should have added the words "policy reasons" on the complaint form as an additional reason for disapproval.  Father characterizes the DA's position that Father "was  supposed to know that the reasons for disapproval also included myriad unstated policy reasons[] that were not included in the reasons for the disapproval" as "laughable, if the stakes weren't so serious."  (*Id.* at 39.) Father also contends that the trial court properly concluded that the DA placed him at a disadvantage by waiting to assert his policy-based concerns until the day of the hearing before the trial court on Father's petition.  He maintains that, through ADA Ringwood's actions, the DA waived his ability to rely on appeal on his policy-based reasons for disapproving the Complaint.  Father also suggests that the DA changed the reason for his disapproval decision from evidentiary issues to policy-based concerns on the date of the hearing, because the DA wanted unfettered discretion, which he maintains is contrary to the plain language of Rule 506(B).

Father further argues that the trial court properly concluded that the DA's policy of not criminalizing custody disputes constituted an abuse of discretion, because any such policy is essentially an indication from the DA that he will refuse to prosecute the crimes of interference with the custody of children and concealment of whereabouts of a child. He contends that, while the DA "strenuously emphasized the concept of prosecutorial discretion in justifying [his] decision to disapprove the [C]omplaint," the DA "simply misjudged the analysis of *prima facie* evidence." (*Id.* at 39, 41.) In that regard, Father suggests that, even if Mother could assert some defense at the time of trial, the Complaint itself contains sufficient facts to establish every element of the crimes alleged and the assertion of "a conjured speculative defense cannot negate a showing of *prima facie*" evidence. (*Id.* at 51.) Father also contends that, regardless of which definition of bad faith is applied to the circumstances presented here, the DA's "refusal to investigate and the rubberstamp disapproval of the [C]omplaint" amounted to an abuse of discretion. (*Id.* at 54.)

In sum, Father maintains that this Court should affirm the Superior Court's decision because the Superior Court concluded: (1) Father presented sufficient evidence to demonstrate that the DA abused his discretion by disapproving the Complaint; (2) "there were reasonable grounds for the trial court's decision;" and (3) the DA's stated policy-based reasons deviate from moral rectitude and sound thinking, and, therefore, the DA acted in bad faith.[10]

---

[10] Aside from the merits, Father raises objections to the "appropriateness and standing" of OAG and PDAA as *amicus* in this matter, contending: (1) OAG and PDAA have raised a constitutional separation of powers issue that was not raised before the Superior Court; and (2) there is an apparent conflict of interest because the attorney who represented the Commonwealth before the Superior Court now represents OAG and PDAA. We reject these objections. We see no apparent conflict of interest nor are we convinced that the OAG and PDAA have raised in their briefs wholly new issues not encompassed within the briefing of the Commonwealth.

(continued…)

## IV. ANALYSIS

While this Court has previously weighed in on the standard of review applicable to a prosecutor's disapproval decision under Rule 506(B), we have not offered any definitive guidance by majority consensus on the subject—except to conclude that "a [court of common pleas] should not interfere with a prosecutor's policy-based decision to disapprove a private [criminal] complaint absent a showing of bad faith, fraud, or unconstitutionality." *See Brown II*, 708 A.2d at 84; *see also id.* at 86 (Cappy, J., opinion in support of reversal). Thus, we begin by establishing the standard of review that a court of common pleas must apply when reviewing a prosecutor's disapproval determination. We hold that, when reviewing a prosecutor's decision disapproving a private criminal complaint under Rule 506, a court of common pleas may only overturn that decision if the private complainant demonstrates that the disapproval decision amounted to bad faith, occurred due to fraud, or was unconstitutional. In so holding, we denounce the prior rubric, where the applicable standard of review depended on the asserted basis for the prosecutor's disapproval decision. *See, e.g.*, *Benz*, 565 A.2d at 767-68; *In re Wilson*, 879 A.2d at 214-15. In addition, for purposes of determining whether the prosecutor's disapproval decision amounted to bad faith, we adopt the definition of bad faith advanced by Justice Cappy in his opinion in support of reversal in *Brown II* and hold that bad faith is demonstrated when the prosecutor acted with a fraudulent, dishonest, or corrupt purpose. *See Brown II*, 708 A.2d at 87 (Cappy, J., opinion in support of reversal). We note that the adoption of the foregoing standard of review ensures that a court of common pleas will afford proper deference to the discretionary decision of the prosecutor—a

---

Additionally, throughout his brief, Father sets forth what the Commonwealth refers to as "distortions of the record" and "misrepresentations." (Commonwealth's Reply Br. at 2, 5.) The Commonwealth responds to these "distortions" and "misrepresentations" at length in its reply brief. (*See id.* at 2-22.) We find no reason to resolve this disagreement, as the alleged distortions and/or misrepresentations have not factored into our disposition.

member of the executive branch of the Commonwealth's government. *See Brown II*, 708 A.2d at 84-85.

We must now apply the above standard of review to the facts of this case and determine whether Father has demonstrated that the DA's decision to disapprove the Complaint amounted to bad faith, occurred due to fraud, or was unconstitutional. In so doing, we recognize that, under ordinary circumstances, we would be "limited to ascertaining the propriety of the trial court's actions."[11] *Commonwealth v. Brown*, 669 A.2d 984, 990 (Pa. Super. 1998) (*Brown I*) (emphasis omitted). The circumstances presented here, however, are far from ordinary because, through this decision, we have created a new standard of review that a court of common pleas must apply when reviewing a prosecutor's disapproval decision. As a result, the trial court could not have applied that standard of review when it reviewed and overturned the DA's decision disapproving the Complaint. In the interests of judicial economy, however, rather than remanding the matter to the trial court for the trial court to apply the above-stated standard of review, we will review the DA's disapproval decision to determine whether such decision amounted to bad faith, occurred due to fraud, or was unconstitutional.

---

[11] We recognize that the issue of the appropriate standard of review that an appellate court must apply when reviewing a court of common pleas' decision to overturn a prosecutor's disapproval decision is not presently before this Court for consideration. We would be remiss, however, if we did not express our concerns regarding the Superior Court's application of an abuse of discretion standard to its review of a court of common pleas' decision overturning a prosecutor's disapproval of a private criminal complaint on the basis of bad faith, fraud, and/or unconstitutionality. *See Michaliga*, 947 A.2d at 792-95. A court of common pleas is tasked with the responsibility of determining whether the prosecutor's disapproval decision amounted to bad faith, occurred due to fraud, or was unconstitutional. There is simply nothing about any such determination that requires a court of common pleas to exercise discretion and, as a result, it would be improper for an appellate court to review a court of common pleas' determination for an abuse of discretion.

While we are sympathetic to Father's plight in his efforts to reunite with his children and return them to the United States, sympathy cannot guide our decision today. Based upon the record before us, we cannot conclude that the DA's decision to disapprove the Complaint—*i.e.*, to decline to bring charges against Mother for interference with the custody of her children and concealing the whereabouts of her children—amounted to bad faith, occurred due to fraud, or was unconstitutional. In other words, Father has not alleged nor is there any evidence in the record to suggest that the DA's decision was made with a fraudulent, dishonest, or corrupt purpose, occurred due to fraud, or was unconstitutional. Rather, the record demonstrates that the DA had sound reasons for his disapproval of the Complaint due to the myriad of evidentiary challenges associated with bringing charges against Mother—specifically, (1) the DA's Office's inability to investigate properly Father's accusations against Mother given that all of the witnesses, other than Father, are located in Iraq and that the relevant conduct occurred in Iraq, and (2) the DA's Office's inability to prove that Mother, and not her "powerful uncles," committed the alleged crimes given that the allegations set forth in the Complaint mainly surround the actions of Mother's uncles, not Mother.[12] While we may not have reached the same

---

[12] Given our conclusion above—*i.e.*, that the DA's evidentiary concerns associated with bringing charges against Mother are sufficient to support his discretionary decision to disapprove the Complaint—we need not consider the merits of the DA's policy-based reasons or whether the DA waived his ability to rely upon such policy-based reasons for failure to identify them on the complaint form. We note, however, that Rule 506(B)(2) specifically requires the prosecutor to state the reasons for his or her disapproval decision on the complaint form. Thus, we caution attorneys for the Commonwealth, in the future, to include any reason upon which they intend to rely to support their disapproval decisions on the complaint form. We also note that a private complainant, who seeks to have a court of common pleas review a prosecutor's disapproval decision, and the prosecutor, who seeks to defend a disapproval decision, are entitled to a full and fair opportunity to develop a record of disputed material facts. While we recognize that a "private criminal complainant has no right to an evidentiary hearing in connection with [a court of common pleas'] review of the [prosecutor's] decision to disapprove the private criminal complaint," *In re Wilson*, 879 A.2d at 212-13, there are circumstances where an evidentiary hearing (continued…)

conclusion had we been charged with the responsibility of deciding whether to approve or disapprove the Complaint under Rule 506, this Court cannot interfere with the prosecutor's discretionary decision given that the evidence of record does not establish that the DA's disapproval decision was improper. For all of these reasons, we conclude that Father failed to demonstrate that the DA's decision to disapprove the Complaint amounted to bad faith, occurred due to fraud, or was unconstitutional. Accordingly, we reverse the Superior Court's order.

Chief Justice Todd and Justices Donohue, Dougherty and Mundy join the opinion.

Justice Dougherty files a concurring opinion.

Justice Wecht files a concurring and dissenting opinion.

The Late Chief Justice Baer did not participate in the decision of this matter.

---

may be necessary, particularly where, as here, the prosecutor asserts policy-based reasons in support of his or her disapproval determination. In those circumstances, unsworn oral argument from the prosecutor is insufficient to create a proper record for appellate review.